In 1982, Robert Steven Gilchrist was indicted for capital murder, convicted of murder, and sentenced to life imprisonment. His conviction was affirmed on direct appeal.Gilchrist v. State, 466 So.2d 988 (Ala.Cr.App. 1984), cert. quashed, Ex parte Gilchrist, 466 So.2d 991 (Ala. 1985). In quashing its writ of certiorari, the Alabama Supreme Court held that the District Attorney had improperly assumed the dual roles of both witness and prosecutor at Gilchrist's trial, but that Gilchrist was precluded from challenging the impropriety on appeal because his lawyer had failed to object in the trial court.
Gilchrist subsequently filed a petition for writ of error coram nobis, alleging that his trial counsel's failure to object to the District Attorney's conduct denied him the effective assistance of counsel at trial. This court agreed and, in 1988, reversed the conviction and remanded the cause for a new trial. Gilchrist v. State, 534 So.2d 1120
(Ala.Cr.App. 1988). In 1989, Gilchrist was retried for murder, convicted of that offense, and sentenced to life imprisonment. On this appeal of that conviction, he raises two issues.
In April 1982, 20-year-old Christina Zane disappeared. The initial investigation revealed that the defendant was the last person with whom she had been seen. On May 11, two Mobile police officers went to the defendant's apartment to question him regarding Ms. Zane's disappearance. The defendant was not at home, but the officers met and talked with Derenda Henderson, the defendant's sometime live-in girlfriend. When the officers inquired whether Ms. Henderson knew Ms. Zane, Henderson replied that she did not. The officers told Ms. Henderson they thought the defendant had been "seeing" Ms. Zane and they said they would like to talk to the defendant about Zane's disappearance.
Later that afternoon, Ms. Henderson confronted the defendant with the information she had received from the police and she drove the defendant to the police station, where he made the first of five inculpatory statements regarding Christina Zane. The defendant told the police that he met Christina Zane at a bar, went home with her for the evening, and saw her again a few days later when she came to his apartment. On the second occasion, Zane, the defendant, and the defendant's male roommate had a "sex orgy," after which, according to the defendant, Christina Zane left his apartment and he never saw her again.
After he talked to the police on May 11, the defendant was released and the authorities continued their investigation. Ms. Henderson testified at trial that, in a series of conversations she had with the defendant from May 11 to early June 1982, the *Page 167 
defendant recounted to her how he had killed Christina Zane and hidden her body in a swampy, wooded area. On June 24, the defendant was incarcerated in the Mobile City Jail for an unrelated offense. Ms. Henderson gave statements to the police on July 6, July 7, and July 19. Those statements are not contained in the record. The defendant was served with an arrest warrant for the instant offense on July 15. The defendant made four additional statements after he was incarcerated. At trial, the defendant testified that he was present at the scene of the homicide but did not kill Zane. He claimed that Ms. Henderson, in a jealous rage at finding him with Christina Zane, murdered the girl. Zane's body was never found.
 I
The defendant first argues that the totality of the circumstances surrounding his prosecution was so marred by police misconduct and prosecutorial overreaching that the indictment against him should have been quashed. He argues that the Mobile police devised a plan to circumvent his Fifth and Sixth Amendment rights to counsel by interrogating him in the absence of his counsel and by using his girlfriend, Derenda Henderson, and his cellmate, Steve Puckett, to extract inculpatory statements from him after he had invoked his right to deal with the police only through counsel. He also argues that Mobile District Attorney Chris Galanos exhibited prosecutorial vindictiveness by seeking a capital murder indictment against him because he refused to disclose the location of the victim's body.
The first argument was not raised at trial in the context of a motion to quash the indictment and was made only in relation to the claimed inadmissibility of the defendant's statements. It is, therefore, not preserved for review in the present context, but will be discussed in Part II of this opinion dealing with the admissibility of the defendant's statements.
The second argument was raised before the defendant's first trial and was incorporated by reference at the defendant's second trial when defense counsel refiled "all prior motions." The following response was filed prior to the first trial by the District Attorney:
 "[O]n July 21, 1982, the District Attorney, in response to a query from the defendant, did tell the defendant that if he would tell where the body of Christina Zane was buried, he (the District Attorney) would charge the defendant with murder and recommend a bond of $50,000 to the Court. Conversely, if the defendant refused to disclose the location of Miss Zane's body, he would be charged with capital murder. It is of salient importance to note that (a) this plea bargaining was at the request of the defendant, and (b) this conversation occurred prior to the [presentation of the] defendant's case to the Grand Jury."
The question of the prosecutor's alleged vindictiveness in seeking a capital murder indictment, which was at issue in the first (capital) trial, is simply not at issue on this appeal, which follows the defendant's trial for non-capital murder. Even assuming the first trial was marred by the vindictiveness of the prosecutor's seeking the greater charge, the defendant's remedy for that error would have been a new trial on the lesser charge of murder — exactly what he in fact received, albeit on other grounds.
Prior to the second trial, the court granted a defense motion in limine requesting "the State . . . to refrain from reference to or mention of capital murder or any possible penalties as a result of a conviction for capital murder [because] the defendant is charged with murder." Our review of the trial record reveals that the order in limine was scrupulously followed.
Moreover, there is no violation of due process when a prosecutor carries out a threat made during plea negotiations that, unless the accused agrees to forgo a constitutional right, the prosecutor will have the accused indicted for the more serious of two possible charges to which he is subject.Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663,54 L.Ed.2d 604 (1978). In Bordenkircher, the accused was indicted for uttering a forged instrument. *Page 168 
The state's attorney offered to recommend a reduced 2 to 5-year sentence if the accused would plead guilty, but threatened to seek a reindictment under the habitual offender provision if the accused insisted on going to trial. The accused pleaded not guilty, was convicted of the enhanced offense, and received a mandatory life sentence. 434 U.S. at 358-59,98 S.Ct. at 665-66. The Supreme Court observed that the " 'give-and-take negotiation common in plea bargaining between the prosecutor and the defense, which arguably possess relatively equal bargaining power,' " is distinguishable from "the State's unilateral imposition of a penalty," 434 U.S. at 362,98 S.Ct. at 667, upon a defendant who appeals his conviction, such as which occurred in Blackledge v. Perry, 417 U.S. 21,94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), and North Carolina v. Pearce,395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). The Court concluded that "the course of conduct engaged in by the prosecutor in [Bordenkircher], which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment." Bordenkircher, 434 U.S. at 365,98 S.Ct. at 669.
Here, prior to the first trial, the trial court reviewed in camera the testimony of three witnesses who appeared before the grand jury and concluded that "ample evidence was presented to the Grand Jury to establish probable cause and to justify the [capital] indictment returned against the defendant."
 II
Statements made by the defendant on five separate occasions were admitted against him in the instant trial. He made inculpatory admissions on May 11, July 8, July 20, July 21, and August 4. On this appeal, he challenges the admissibility of only two of the statements, those made on July 20 and July 21. The defendant claims that the statements should have been suppressed because they were obtained in violation of his Fifth and Sixth Amendment rights to counsel, and because they were involuntarily induced or coerced.
We hold, first, that the defendant had no Sixth Amendment right to counsel at the time of the July 20 or 21 statements. Decisions by the United States Supreme Court "have long recognized that the [Sixth Amendment] right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant." United States v. Gouveia,467 U.S. 180, 187, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984). "By its very terms, [the Sixth Amendment] becomes applicable only when the government's role shifts from investigation to accusation." Moran v. Burbine, 475 U.S. 412, 430,106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). "[T]he Sixth Amendment right to counsel does not attach until after the initiation of formal charges." Moran, 475 U.S. at 431, 106 S.Ct. at 1146. The Supreme Court has recognized that, depending on the jurisdiction, the initiation of formal charges may occur at the preliminary hearing, indictment, information, or arraignment.Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882,32 L.Ed.2d 411 (1972).
In Alabama, "the filing of an indictment is the mechanism by which felony prosecutions are initiated. Ala. Const. of 1901, Art. I, § 8, as amended by Amend. 37 (1939); Ross v. State,529 So.2d 1074 (Ala.Cr.App. 1988); State ex rel. Baxley v.Strawbridge, 52 Ala. App. 685, 296 So.2d 779, cert. denied,292 Ala. 506, 296 So.2d 784 (1974)." Callahan v. State,557 So.2d 1292, 1303 n. 2 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala. 1989), cert. denied, ___ U.S. ___, 111 S.Ct. 216,112 L.Ed.2d 176 (1990). Although the record is not entirely clear, it appears that the defendant was first indicted on July 29 in case CC-82-2245. That indictment was later nolle prossed and the defendant was reindicted in case number CC-82-2705. The second indictment was also nolle prossed, and the defendant was indicted for the third time on September 13 in case number CC-82-2899.
In Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157,7 L.Ed.2d 114 (1961), the United States Supreme Court held that, in Alabama, *Page 169 
arraignment is such "a critical stage in a criminal proceeding," 368 U.S. at 53, 82 S.Ct. at 158, that a defendant may not be deprived of his Sixth Amendment right to counsel at that point. Cf. Ala. Code § 15-12-20 (1975) (trial judge to ascertain before arraignment whether defendant is represented by counsel, whether defendant desires counsel, and whether defendant is financially able to obtain counsel); § 15-12-21(a) (if trial court determines that defendant desires counsel, but cannot afford same, trial court to appoint counsel). Other than the allegation, in a defense pleading styled "Instanter Motion for Contempt," that the defendant was arraigned July 23, there is no indication of the date of arraignment in the record.[1]
Although this allegation appears undisputed, this arraignment date is somewhat surprising in view of the indictment dates set out in the preceding paragraph. Even if we assume that this is the correct date of the defendant's arraignment, it is clear that the earliest the defendant's Sixth Amendment right to counsel would have attached was July 23. On July 20 and 21, the dates of the challenged statements, the defendant clearly had not been indicted, arraigned, or had a preliminary hearing. Consequently, his Sixth Amendment right to counsel had not attached at the time those statements were given.
The defendant claims that law enforcement officials were prohibited from talking to him by virtue of the fact that the police knew he was represented by counsel, were aware that counsel had advised him not to make any statements, and had themselves been told by counsel not to question him in the absence of counsel. It is unclear whether he bases this argument on the Fifth or on the Sixth Amendment right to counsel. The argument has no merit, however, under either constitutional provision. Only the accused can invoke the Fifth Amendment right to counsel; it is a personal right which may not be asserted by the accused's lawyer. Moran v. Burbine,475 U.S. at 433 n. 4, 106 S.Ct. at 1147 n. 4 ("This argument entirely disregards the elemental and established proposition that the privilege against compulsory self-incrimination is, by hypothesis, a personal one that can only be invoked by the individual whose testimony is being compelled").
Moran v. Burbine, supra, and Maine v. Moulton, 474 U.S. 159,106 S.Ct. 477, 88 L.Ed.2d 481 (1985), foreclose the argument that either the existence of the attorney-client relationship or the fact of custodial interrogation triggers the Sixth Amendment guarantee before the initiation of adversary proceedings. See also Ex parte Neelley, 494 So.2d 697, 699
(Ala. 1986); Chandler v. State, 426 So.2d 477, 480 (Ala.Cr.App. 1982), cert. denied, 480 U.S. 926, 107 S.Ct. 1389,94 L.Ed.2d 702 (1987) ("The fact that a defendant has legal counsel does not, as a per se rule, prohibit law enforcement officials from procuring a statement of any kind from the appellant, without first giving notice to and receiving consent from his counsel"); Eakes v. State, 387 So.2d 855, 860 (Ala.Cr.App. 1978) (same); Thompson v. State, 347 So.2d 1371, 1376
(Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala. 1977), cert. denied, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765 (1978) (same).
In Moran, the accused argued that "[t]he right to non-interference with an attorney's dealings with a criminal suspect . . . arises the moment the relationship is formed, or, at the very least, once the defendant is placed in custodial interrogation." 475 U.S. at 429, 106 S.Ct. at 1145. The Court answered that argument as follows:
 "[W]e find respondent's understanding of the Sixth Amendment both practically and theoretically unsound. As a practical matter, it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation. More importantly, the suggestion that the existence *Page 170 
of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any 'criminal prosecutio[n],' . . . the accused shall not be left to his own devices in facing the ' "prosecutorial forces of organized society." ' By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the 'intricacies . . . of law,' is needed to assure that the prosecution's case encounters 'the crucible of meaningful adversarial testing.'
 ". . . [T]he [Maine v. Moulton] decision all but forecloses respondent's argument that the attorney-client relationship itself triggers the Sixth Amendment right."
Moran v. Burbine, 475 U.S. at 430-31, 106 S.Ct. at 1145-46
(citations omitted).
The defendant next contends that the Mobile police violated his Fifth Amendment right to counsel when they continued to interrogate him after he stated that he wanted to speak to his attorney, in violation of Edwards v. Arizona, 451 U.S. 477,101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
On July 8, Mobile Detective Sergeant John Boone had the defendant brought from his jail cell to an interview room at the Criminal Investigation Division of the Mobile Police Department. Boone told the defendant that he had "some new information that had developed on the investigation and that [the defendant] was probably going to be arrested later on in the week." The defendant replied that "if [Boone] had new information that new information could only have come from someone that [the defendant] told, and [the defendant] had only told one person and [the defendant] knew who he had told." The defendant then said that he wanted to contact his attorney. The interview ended and the defendant was returned to his cell.
On July 20, Derenda Henderson came to the Mobile Police Department to see the defendant. The testimony regarding who originated the idea of a meeting between the defendant and Ms. Henderson on July 20 is in conflict. During the hearing on the motion to suppress defendant's statements at the first trial (the transcript of which the trial court ordered incorporated into the instant proceedings), Sergeant Boone testified that Ms. Henderson telephoned him and wanted to know if he could "arrange a meeting" between the defendant and her. Boone replied that he could and Ms. Henderson came down to the station. Boone then had the defendant brought down from his cell, informed him that he had a visitor, and inquired whether he would like to see Ms. Henderson. At the same hearing, the defendant testified that he called Boone and requested the meeting with Ms. Henderson after his cellmate, Steve Puckett, relayed a message to him that if he (defendant) would call Boone, he would "get to see his wife."[2] At the second trial, both Sergeant Boone and Captain Wilbur Williams testified that the defendant called Boone on July 20 and asked him to set up a meeting with Ms. Henderson.
At the hearing on the motion to suppress, Steve Puckett testified that he was arrested for robbery on June 29 and incarcerated in the Mobile city jail. At some point he was transferred to a cell with the defendant, where he remained from July 20 to July 22. Puckett acknowledged having several conversations with Sergeant Boone about the defendant and he acknowledged *Page 171 
telling the defendant "if I were you, I'd call them [the homicide detectives]." He stated that he was not instructed to "get any information from" the defendant, but he admitted giving the police a statement on July 22 concerning things the defendant had told him. He denied being promised anything for his cooperation, but acknowledged that his robbery charge was nol-prossed on July 29.
The following facts regarding the July 20 meeting between Ms. Henderson and the defendant are undisputed: The defendant and Ms. Henderson met privately in an interview room with a one-way glass. The defendant was told that Ms. Henderson was there to see him and that he did not have to see her. Both the defendant and Ms. Henderson were informed that officers Boone and Williams would be just outside the door and would maintain visual contact with them but that there were no listening or recording devices in the room and the officers would not be able to hear them.
Officers Boone and Williams recorded, on a "Narrative Form" which was admitted in evidence, the following version of the events leading up to the July 20 meeting between Ms. Henderson and the defendant:
 "This interview is being conducted in Homicide Offices on Church Street today, July 20, 1982. It is 1:20 p.m. Lt. Vince Richardson, Sgt. John Boone and Derenda Henderson are present at the interview:
 "Q. Derenda, you have come down here today for the purpose of seeing Steven Gilchrist, is that right?
"A. Yes sir.
 "Q. You understand that I am going to make arrangements for you to see him because you want to see him, is that right?
"A. Yes sir.
 "Q. I'm not sending you in there to see him to act as my agent to get information from him, do you understand that?
"A. Uh-huh.
 "Q. OK, this will be a controlled interview, a meeting with him. You will be placed in a room where there are no microphones, we will not be able to hear what you say, however, I will be able to see you so that there will be no harm coming to you, you understand that?
"A. Uh-huh.
 "Q. This is a 'no strings attached' meeting between you and Steve Gilchrist you understand?
"A. Yes sir.
 "Q. And after me telling you all this, you still want to see him, is that right?
"A. Uh-huh, I do.
 "Q. [To defendant] It's one-fifty p.m. (1:50) Sgt. Williams and I, Sgt. John Boone, have asked that you be brought down here. We want to tell you something. There is a young lady here to see you. If you want to see her, we'll let you see her. If you don't want to see her, we'll send you back upstairs.
"A. [By defendant] All right sir.
 "Q. She requested our assistance in making it possible for her to see you. And we can't force you to see her, you can see her if you'd like or if you don't want to, you don't have to. I just wanted to tell you that and what we say is being recorded so that later on, it can't be said that we're trying to trick you in any kind of way. Or that we're using any element of surprise or anything like that. You will be allowed to see her if you wish, in the front interviewing room, it has a one-way glass. We will be on the other side of a one-way glass — there is no sound device in the room, there's no wiring. I will not be able to hear what you say. I will not be able to hear what she says. She is the one that suggested this meeting. She wants to talk to you. Do you want to see her?
 "A. I wouldn't know until you tell me who it is first.
"Q. It's Derenda.
 "A. She wants to see me? The conversation is not recorded between myself and her whatsoever?
"Q. It certainly is not.
"A. Are you monitoring, is anybody monitoring? *Page 172 
 "Q. No one is monitoring. We're gonna keep visual contact on you Steve, and that's at her request.
"A. I appreciate that.
 "Q. You can go over the room, you'll be in there, you can look — You'll have to take our word for it. I don't think you have reason to doubt us because we haven't lied to you up to now. The only thing we can tell you is there is no v__________
 "A. I'd like to say that would be wonderful. I would have asked for it before this __________
 "Q. There are no listening devices in there. That's the only reason we using this __________
"A. That's fine. Let's get on with it.
"Q. Do you want to see her?
"A. Yes, sir."
Officers Boone and Williams watched the meeting through the glass and did not hear most of what was said. At one point, however, they overheard the defendant, in a loud voice, say, "The girl is dead. I can't bring her back. Do you think I should die because of it? I did it for you." The defendant denied making that statement.
Sometime during the meeting between the defendant and Ms. Henderson, the defendant's lawyers arrived at the city jail and asked to see their client. The jailer on duty relayed word to Sergeant Boone and Captain Williams that the attorneys were waiting. Boone and Williams then "terminated the interview" between Ms. Henderson and the defendant, and informed the defendant that his lawyers were there. At that point, the defendant conferred in a room alone with his lawyers.
The conference was interrupted when District Attorney Chris Galanos knocked on the door. One of the defense lawyers immediately said that his client did not want to make a statement. Galanos then asked the defendant, in the presence of his attorneys, "Is it not a fact that you asked for me to come over here to see you, and . . . that you did not want your lawyers to know that I was going to talk to you?" According to Galanos, the defendant answered "yes" to both questions. The defendant testified, at the hearing on motion to suppress, that he answered "no" to both questions. The District Attorney left and defense counsel stated to all the police officers present that the defendant had been advised not to say anything, that he in fact had nothing to say, and that he wanted to return to his cell.
The events of the following day, July 21, are also in dispute. The one undisputed fact is that the defendant called Sergeant Boone with a request to meet with Ms. Henderson again. The defendant testified that he made the call at the insistence of his cellmate Steve Puckett, who urged him to contact Boone or relayed a message from Boone that the sergeant wanted the defendant to call. Sergeant Boone testified that the defendant asked that his attorneys not be told of the proposed meeting with Ms. Henderson. According to Boone, the defendant said that his attorneys "advised him not to say anything but he wanted . . . to talk, to get something going on his case."
Boone arranged to have Ms. Henderson picked up in a police car and brought to the station. While they were waiting for her to arrive, Boone told the defendant that he "wanted to know the location of the body of Christina Zane." According to Boone, the defendant said that "if he did know where the body was that after he talked to Derenda Henderson he would decide whether or not he would, quote, give us what we want, end quote."
The defendant met privately with Ms. Henderson. They were not placed in the room with the one-way glass and no law enforcement officials monitored their conversation. During their meeting, the defense attorneys arrived again. The defendant was informed of their presence and, according to Boone, the defendant asked that he (defendant) be sent "back upstairs to the lockup and not to tell [the lawyers] that he was down there talking to [the police], and after [the lawyers] left, for [the police] to call him back down." The defendant denied making this or any other statement indicating that he did not want to follow his lawyers' advice or to have them know that he was going to "talk." He *Page 173 
testified that he was told by Sergeant Boone and other officers that if he insisted on having his lawyers there, he would not be able to see Ms. Henderson and there would be nothing the officers could do for him.
Boone sent the defendant upstairs and had him brought back down after defense counsel left the building. The defendant was allowed to see Ms. Henderson alone for 20 to 30 minutes. The defendant then asked to speak to Ms. Henderson and Boone together. The three met for about 25 minutes, after which the defendant stated, "I am ready to give you what you want," and shook hands with Boone.
The defendant asked to call his parents so he could "tell them the truth before they heard it on the evening news or read it in the newspaper." As he hung up the telephone after talking to his father he said, "Good lord, I need some boots to go out there." When he was told it was "customary procedure" to put leg irons on a prisoner leaving the jail, the defendant commented that "he'd have trouble walking out there in them woods with those on."
At some point before the defendant's parents arrived, District Attorney Galanos was "summoned . . . to meet with Steven Gilchrist." Galanos testified:[3]
 "Q. [by the assistant district attorney]: Did you have a discussion with the defendant?
"A. Yes, sir, I did.
"Q. All right.
"A. Again, there was a series of questions asked.
"Q. Do you recall what those questions were?
 "A. Vividly. One was: Mr. Gilchrist, is it a fact that you asked to see me? He said, 'yes.' I then asked him if he wanted the meeting tape recorded to protect both himself and myself. He said he did not. I then asked him if he wanted his lawyers present. He said he did not. I then said, as I understand it the purpose of this meeting is for you to ask me questions but I am not to ask you questions and he said, 'that's right.'
"Q. Did he in fact ask you some questions?
"A. He asked numerous questions.
"Q. Did you respond to them?
"A. Yes, sir.
"Q. What area were these questions dealing with?
 "A. They essentially concerned, number one, what he would be charged with. Number two, under what circumstances would he be charged with capital murder or alternatively would he be charged with murder. Number three, if charged with murder and convicted where would he spend his jail time, how would he spend his jail time. He even asked me how I assessed his chances of prevailing on the insanity plea. And in response to the questions I in essence said that if you will produce the body of Christina Zane, confess to the crime according to the letter of the law then as an act of decency towards the Zane family I will charge you with murder. If, however, since you've asked me these questions, Mr. Gilchrist, you opt not to cooperate which is to say not confess, not produce the body, then you in all likelihood will be charged with capital murder. *Page 174 
 "Q. All right. And that was made in response to his questions?
"A. All of this was in response to questions.
 "Q. All right. Did you in fact ask him any questions other than the initial questions about the tape recorder and the understanding that you had?
"A. No, sir."
The defendant's mother, father, and attorneys arrived. The defendant met with his parents and counsel together, after which he declined to make any further statements. He was returned to his cell.
Miranda v. Arizona, 384 U.S. 436, 477-78, 86 S.Ct. 1602,1629, 16 L.Ed.2d 694 (1966), guarantees the right to counsel during "custodial interrogation." It is clear that on July 20 and 21, the defendant was in custody, since he was incarcerated in the city jail. Once the defendant asked for counsel on July 8, the Fifth Amendment prohibited the police from interrogating him further until counsel had been made available to him or he "initiate[d] further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. at 484-85,101 S.Ct. at 1885.
In order to find that the Mobile police obtained statements from the defendant on July 20 and 21 in violation of his Fifth Amendment rights, this court would have to find that the defendant (1) was interrogated and (2) did not initiate the exchanges with the police. The United States Supreme Court has provided some guidelines regarding the definition of both "interrogation" and "initiation." See Rhode Island v. Innis,446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); Oregon v.Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
In Rhode Island v. Innis, the Supreme Court held that the rationale of the Miranda decision prohibited not only express questioning by the police, but also its "functional equivalent." "[A]ny words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" are the functional equivalent of interrogation. 446 U.S. at 301,100 S.Ct. at 1689-90 (footnotes omitted).
In Oregon v. Bradshaw, the Court defined "initiation" as an inquiry which can be "fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation."462 U.S. at 1045, 103 S.Ct. at 2835.
 The July 20 Statements
In Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931,95 L.Ed.2d 458 (1987), the accused admitted to law enforcement officers that he had just killed his son. He directed the police to the child's body and then stated, after being given his Miranda
rights, that he did not want to talk any further without a lawyer. The accused's wife was allowed to meet with him in the presence of an officer who tape-recorded their conversation.
Responding to the definition provided in Innis, that "interrogation" includes a "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect," 446 U.S. at 301, 100 S.Ct. at 1689-90, the Arizona Supreme Court determined that the tape was the inadmissible product of an interrogation because the officers who allowed the meeting between the spouses and tape-recorded their statements admitted they " 'knew that if the conversation took place, incriminating statements were likely to be made.' " See Arizona v. Mauro, 481 U.S. at 525, 107 S.Ct. at 1934.
The Supreme Court reversed. It held that no "interrogation" had occurred because (1) there was no evidence that Mauro's wife was sent "in to see her husband for the purpose of eliciting incriminating statements," 481 U.S. at 528,107 S.Ct. at 1936, (2) viewing the situation from Mauro's perspective, it was unlikely that Mauro would have felt "that he was being coerced to incriminate himself" by his wife's presence,id., and (3) the "decision to allow Mauro's wife to see him was [not] the kind of psychological ploy that properly could be *Page 175 
treated as the functional equivalent of interrogation,"481 U.S. at 527, 107 S.Ct. at 1935 (footnote omitted). The decision indicates that in the absence of "compelling influences, psychological ploys, or direct questioning," the "possibility" that an accused will incriminate himself, and even the subjective "hope" on the part of the police that he will do so, is not the functional equivalent of interrogation.Mauro, 481 U.S. at 528-29, 107 S.Ct. at 1936-37.
Justice Stevens dissented on the ground that setting up the meeting was a "powerful psychological ploy" because Mr. Mauro had insufficient advance warning of his wife's coming to talk to him and because the police "set up a confrontation between [the spouses] when [Mr. Mauro] manifestly desired to remain silent." Mauro, 481 U.S. at 531, 107 S.Ct. at 1937-38 (Stevens, J., dissenting).
If nothing else, Mauro makes it clear that in the instant case the subjective motivation of the Mobile police, who obviously "hoped" the defendant would incriminate himself by revealing the location of the murder victim's body during his conversation with Derenda Henderson, does not of itself make the encounter an "interrogation." Also, as in Mauro, there was no evidence here that Ms. Henderson was sent "in to see [the defendant] for the purpose of eliciting incriminating statements." 481 U.S. at 528, 107 S.Ct. at 1936. In fact, there was evidence to the contrary. The narrative form on which Sergeant Boone recorded his July 20 interview with Ms. Henderson specifically states that Boone was "not sending [Ms. Henderson] in there to see [the defendant] to act as [Boone's] agent to get information from [the defendant]."
There is no evidence in this record that the police ever asked or directed, or induced or threatened Ms. Henderson to get information from the defendant. She cannot, therefore, be deemed an "agent" of the police. See State v. Bruneau, 131 N.H. 104,552 A.2d 585, 588 (1988) (Souter, J.) (establishing an agency relationship between the police and a third party "require[s] proof of some affirmative action by a police officer or other governmental official that preceded the interrogation and can reasonably be seen to have induced the third party to conduct the interrogation that took place"). See also United States v. Taylor, 800 F.2d 1012, 1016 (10th Cir. 1986), cert. denied, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81
(1987) ("No agreement was made between [the informant] and the government and no benefits accrued to [the informant] for his cooperation").
Aside from these observations, however, we find the instant case more problematic than Mauro, particularly on the issues of whether the decision to allow Ms. Henderson to meet with the defendant was "the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation," and whether the defendant "felt coerced to incriminate himself" by his meeting with her.
In Mauro, the police had no prior knowledge of either the husband or the wife and they " 'really had no idea of what to expect' " from a meeting between them. 481 U.S. at 524,107 S.Ct. at 1934. Here, the Mobile police had, by July 20, already had the opportunity to assess the defendant's relationship with Ms. Henderson, to gauge his susceptibility to her suggestions, and to surmise what effect her presence might have on him. They knew she was the one who drove him to the police station for his first statement to them, and they knew, presumably,[4] that she was the one person to whom the defendant had already admitted his involvement in Christina Zane's murder. Furthermore, they could reasonably have assumed that she was angry about the defendant's sexual liaison with Zane and that she might have been motivated by jealous revenge to elicit incriminating *Page 176 
statements from him. Thus, we cannot say, as the Mauro Court did, that the police here "really had no idea of what to expect" from a meeting between the defendant and Ms. Henderson, or that there was "no suggestion and no evidence" that the July 20 meeting was a "psychological ploy that could properly be treated as the functional equivalent of interrogation," or caused defendant to "feel coerced."
Significantly, however, the factors which suggested a "psychological ploy" to Justice Stevens, writing in dissent — insufficient advance warning to Mr. Mauro that his wife was coming to see him and Mauro's unwillingness to talk to her —are absent here. Ms. Henderson's arrival, the ground rules of her visit, and the physical set-up of the room where they were to meet were all fully explained to the defendant. He was, it appears, not only willing to see her, but positively jubilant at the prospect. These two circumstances are sufficiently different from Mauro to find that, while the Mobile police may have been aware of the psychological influence Derenda Henderson had on the defendant, they did not deceptively
exploit that influence.
Most of the police interrogation practices or "psychological ploys" about which the Miranda Court expressed concern have an element of deception or subterfuge about them:
 "The questioned practices included 'the use of lineups in which a coached witness would pick the defendant as the perpetrator . . . [,] the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime,' and a variety of 'psychological ploys, such as to "posi[t]" "the guilt of the subject," to "minimize the moral seriousness of the offense," and "to cast blame on the victim or on society." ' "
Mauro, 481 U.S. at 526, 107 S.Ct. at 1935 (quoting Rhode Islandv. Innis, 446 U.S. at 299, 100 S.Ct. at 1689, (quoting Mirandav. Arizona, 384 U.S. at. 450, 86 S.Ct. at 1615)) (brackets added by the Innis Court).
One of our own cases has focused on lack ofdeception to hold that the trial court did not err in admitting a confession which the accused made to his wife and which was overheard by a police officer while the wife was visiting the accused in jail. In Lawrence v. State, 441 So.2d 1021, 1029
(Ala.Cr.App. 1983), this court noted the absence of " 'any trickery, deception, artifice, subterfuge, or underhanded or unfair law enforcement practices' of officers or anyone acting on behalf of officers as to the conversation between appellant and his wife." See also Ex parte Singleton, 465 So.2d 443-45 (Ala. 1985) ("Before the defendant made the oral statement, he was permitted to see his girlfriend . . . in a room alone for approximately thirty minutes").
Cases from other jurisdictions have recognized that while there is undoubtedly a psychological influence exerted upon an accused when he is visited in jail and urged to confess by a family member or close friend, the police do not transgress the Fifth Amendment by arranging such visits unless they instruct the visitor to elicit information or unless they know of, and therefore can be deemed to have sanctioned, the visitor's deception of the accused. Compare United States v. Gaddy,894 F.2d 1307, 1311 (11th Cir. 1990) (accused not "interrogated" when his aunt, a police department employee, urged him, without prompting by police, to reveal information); Snethen v. Nix,885 F.2d 456, 457 (8th Cir. 1989), cert. denied, ___ U.S. ___,110 S.Ct. 3223, 110 L.Ed.2d 670 (1990) (accused not "interrogated" when his mother, who gained access to him in prison by telling police "[i]f [my son] did this, he will tell me," exhorted accused to confess so that her other son, accused's half-brother, would not be unjustly punished); Peoplev. Lucas, 132 Ill.2d 399, 419, 139 Ill.Dec. 447, 454,548 N.E.2d 1003, 1010 (1989) ("So long as the police have not incited or coached family members to prompt a confession, the fact that the defendant chose to speak to the police after conferring with [his mother and brother] does not make his waiver invalid"); and State v. Romero, 552 So.2d 45, 50-52
(La.App. 1989), cert. denied, 559 So.2d 137 (1990) (accused not "interrogated" when his father asked him, in presence of officer, "Son, did you really do *Page 177 
that?") with State v. Perkins, 753 S.W.2d 567, 571 (Mo.App. 1988) ("Appellant's Miranda rights were violated when the police, through subterfuge and trickery in the form of [appellant's brother], a paid agent, elicited statements from appellant").
Although we find this to be an extremely close issue, we do not believe the meeting arranged between the defendant and Derenda Henderson on July 20 was the "kind of psychological ploy that properly could be treated as the functional equivalent of interrogation," Mauro, 481 U.S. at 527,107 S.Ct. at 1935, because there was no evidence either that Ms. Henderson was instructed to elicit information from the defendant or that she practiced deception upon the defendant.
Following the remaining part of the test suggested byMauro, we must determine whether, viewing the situation from defendant's perspective, the defendant "felt that he was being coerced to incriminate himself in any way" by Ms. Henderson's July 20 visit. On this issue, we find the following observation by the Court in Mauro particularly instructive:
 "In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in Miranda and Edwards:
preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. The government actions in this case do not implicate this purpose in any way. Police departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must they ignore legitimate security concerns by allowing spouses to meet in private. In short, the officers in this case acted reasonably and lawfully by allowing Mrs. Mauro to speak with her husband."
Mauro, 481 U.S. at 529-30, 107 S.Ct. at 1937 (emphasis added). We would be ignoring the plain facts of the instant case if we concluded that the Mobile police used the coercive nature of defendant's confinement to extract from him an inculpatory statement he would not otherwise have made to Ms. Henderson in an unrestrained environment. On July 20, in the interview room at the police station, the defendant made the same kind of inculpatory statement to Ms. Henderson that he had been making to her over a period of weeks one month earlier in the free world.
If the defendant was "coerced" to incriminate himself on July 20, the coercion was effected by Ms. Henderson individually and not by any conduct on the part of the police. Cf. Snethen v.Nix, 885 F.2d at 459-60 ("Snethen's mother prodded Snethen, both in the presence of police and in a private discussion, to describe the . . . killing to the police so his half-brother would not be punished unjustly"; thus "[i]t was 'coercion' by his mother that led to Snethen's inculpatory remarks, not by the police"). Even if Ms. Henderson's motivation for meeting with the defendant had been revenge, whatever "coercion" that vengeance may have exerted on the defendant cannot be attributed to the Mobile police. See Colorado v. Connelly,479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).
In Connelly, the accused, who suffered from "command hallucinations" incident to chronic schizophrenia, heard the "voice of God" telling him to confess. The Supreme Court held that his confession was not "coerced" within the meaning of the Fifth Amendment because it was not the product of police misconduct. Observing that the Fifth Amendment simply does not address itself to " 'moral and psychological pressures to confess emanating from sources other than official coercion,' " the Court held that only "governmental coercion" is proscribed by that constitutional provision. Connelly, 479 U.S. at 170,107 S.Ct. at 523 (emphasis added).
We have found that Ms. Henderson was not an agent of the police because there is no evidence that she was instructed by the police to question the defendant or to get information from him. We have also determined that her meeting with the defendant was not a psychological ploy functionally equivalent to interrogation. We now conclude that any "coercion" she exerted upon the defendant to incriminate himself emanated *Page 178 
from moral and psychological pressures inherent in the nature of their relationship and not from any police misconduct. Because we hold that the July 20 statement was not the product of interrogation, we need not determine whether the defendant "initiated" the encounter on that occasion.
 The July 21 Statements
When Sergeant Boone told the defendant that he (Boone) "wanted to know the location of the body of Christina Zane," he clearly "interrogated" the defendant. We find, however, that the statements following the interrogation were admissible under Edwards v. Arizona, 451 U.S. 477, 485-86, n. 9,101 S.Ct. 1880, 1885-86, n. 9, 68 L.Ed.2d 378 (1981); Oregon v. Bradshaw,462 U.S. 1039, 1044-46, 103 S.Ct. 2830, 2834-35, 77 L.Ed.2d 405
(1983); and Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490,492-93, 83 L.Ed.2d 488 (1984), because the defendant "initiate[d] further communication, exchanges, or conversations with the police" and waived his previously invoked right to counsel.
The initiation occurred on July 21, when the defendant called Sergeant Boone, asked to see Ms. Henderson again, and told Boone that his attorneys had "advised him not to say anything but he wanted . . . to talk, to get something going on his case." See Lindsey v. Smith, 820 F.2d 1137, 1148 (11th Cir. 1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327,103 L.Ed.2d 595 (1989) (accused said "well, I'll talk to you"); Peoples v.State, 510 So.2d 554, 570 (Ala.Cr.App. 1986), affirmed,510 So.2d 574 (Ala.), cert. denied, 484 U.S. 933, 108 S.Ct. 307,98 L.Ed.2d 266 (1987) (accused stated, "I don't need a lawyer. I'll just talk to y'all"); Fike v. State, 447 So.2d 850, 854
(Ala.Cr.App. 1983) (accused said he "wanted to talk").
The defendant claims that his calling Boone was prompted by a message from Boone, relayed to the defendant by his cellmate Steve Puckett, to call Boone. The trial court made no express factual finding on this issue. The evidence necessary to uphold the ruling on the motion to suppress — that defendant of his own accord voluntarily telephoned Sergeant Boone on July 21 — though disputed, is not "palpably contrary to the weight of the evidence" on this point, and therefore suffices to uphold the trial court's ruling. Singleton v. State, 465 So.2d 432, 436
(Ala.Cr.App. 1983), affirmed, 465 So.2d 443 (Ala. 1985). See also Isbell v. State, 428 So.2d 215, 217 (Ala.Cr.App. 1983);Coots v. State, 434 So.2d 864, 867 (Ala.Cr.App. 1983).
Moreover, even assuming that Sergeant Boone sent the defendant a message to call him, the message was not so oppressive or coercive that it constituted interrogation in violation of the Edwards rule. See State v. Allen,323 N.C. 208, 216, 372 S.E.2d 855, 860 (1988) (after accused requested a lawyer, Detective Warren said "all he wanted was the truth, that [accused] would be returned to his jail cell and there would be no further interview with him, [but] that if [accused] wished to have a further conversation he should call an officer, [and if accused] called for an officer, he should ask for Mr. Warren"); Fox v. State, 779 P.2d 562, 569 (Okla.Cr.App. 1989), cert. denied, ___ U.S ___, 110 S.Ct. 1538,108 L.Ed.2d 777 (1990) (after accused invoked right to counsel, two homicide detectives went to the jail to see accused, accused was brought out of his cell, and detectives gave him their business cards "in case he or his attorney desired to contact the police").
"[W]here the accused has specifically invoked his right to counsel . . . [any subsequent waiver] must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023,82 L.Ed. 1461 (1938)." Edwards v. Arizona, 451 U.S. at 482,101 S.Ct. at 1884.
Applying this standard, we conclude that the defendant knowingly, intelligently, and voluntarily waived his previously invoked right to counsel. The defendant's "attorney[s'] *Page 179 
explicit instructions not to talk to the police . . . indicate that [the defendant] fully understood the rights he waived."Lindsey v. Smith, 820 F.2d at 1150 (emphasis added). See Peoplev. Thompson, 50 Cal.3d 134, 166, 266 Cal.Rptr. 309, 325-26,785 P.2d 857, 873, cert. denied, ___ U.S. ___, 111 S.Ct. 226,112 L.Ed.2d 180 (1990) (accused's statements "were intended to communicate . . . that, despite the advice he had received from the public defender, he was willing to talk").
Furthermore, the defendant's comment that "after he talked to Derenda Henderson he would decide whether or not he would, quote, give [the police] what [they] want[ed], end quote," indicates the voluntariness with which he was proceeding on July 21. The comment demonstrates his feeling of non-coercion by the police or by Ms. Henderson, and his reliance on his own decision-making ability. In short, the defendant's own comments show "that [his] decision to give the statements was a strategic choice voluntarily made." Lindsey v. Smith,820 F.2d at 1150.
We likewise conclude that all of the defendant's statements on both July 20 and 21 were voluntary. They were neither coerced by threats of the death penalty nor induced by promises of "contact visits" with Ms. Henderson.
In Lamar v. State, 465 So.2d 1193, 1194 (Ala.Cr.App. 1984), the accused argued that his confession was involuntary because a police officer advised him that he could be charged with a more serious offense. This court held that because the accused "himself initiated the conversation about the seriousness of the charge," id., there was no threat or coercion in the officer's honest response to the defendant's inquiry. Here, "[t]he trial court's determination that the statements were given voluntarily . . . contains an implicit factual finding against [the defendant's] credibility," and in favor of the credibility of District Attorney Galanos on this issue. Lindseyv. Smith, 820 F.2d at 1150. Thus, because the statements made by Galanos to the defendant about the death penalty were in response to the defendant's own questions about what charges would be brought, Galanos's truthful reply did not constitute a "threat."
The defendant's argument that his inculpatory statements were induced by promises of contact visits with Ms. Henderson is simply not supported by the evidence. There was no testimony the defendant was told that, if he confessed, he would be allowed to see Ms. Henderson. Even the testimony most favorable to the defendant established only that if the defendant "called Sergeant Boone" or did not "insist on having his lawyers there," he would be allowed to see Ms. Henderson.
Furthermore, even if the defendant had been promised that he could see Ms. Henderson if he confessed, it is clear that no inculpatory statements were made in reliance on the promise. The defendant himself told Sergeant Boone that "after he talked to Derenda Henderson he would decide whether or not he would" confess. "[T]he promise must induce the defendant to waive his Fifth Amendment rights. If defendant did not rely on the promise, he certainly was not induced by it to make a statement." 1 W. LaFave J. Israel, Criminal Procedure § 6.2(c) at 446 n. 71.1 (1984) (1990 Pocket Part at 75) (quotingState ex rel. Collins v. Superior Court, 145 Ariz. 493,702 P.2d 1338 (1985)).
We conclude that, although the defendant was "interrogated" by Sergeant Boone on July 21, the defendant himself initiated the conversation and knowingly, intelligently, and voluntarily waived his rights under the Fifth Amendment. The statements he made on July 20 and 21 were not induced by any promises or coerced by any threats. His inculpatory admissions were voluntary and admissible.
We recognize that this is a close case. Our decision that the defendant received a fair trial is based upon a review of the entire record and upon a consideration of the totality of the circumstances. That review and those circumstances fully convince this court that the defendant's admissions were intelligently, knowingly, and voluntarily made and that they were not the product of police inducement or coercion. *Page 180 
The defendant's conviction for murder is affirmed.
AFFIRMED.
All Judges concur.
[1] Although counsel for both the State and the defense stipulated that the proceedings under cases CC-82-2445 and CC-82-2705 would be incorporated into the court file of case CC-82-2899, not all of the proceedings appear to have been included.
[2] Derenda Henderson and the defendant had been living together for four years prior to the disappearance of Christina Zane. They never had a marriage ceremony, but the defendant sometimes referred to Derenda as his "wife." On the defendant's first appeal to this court in Gilchrist v. State, 466 So.2d 988, the primary issue was whether "any statements made by [the defendant] to Derenda Henderson-Gilchrist should not have been admitted because she is his wife by common law marriage." Id.
at 989. This court upheld the trial court's ruling that no common law marriage existed.
[3] None of the testimony given by District Attorney Galanos was admitted at the defendant's second trial which is the subject of this appeal. However, several law enforcement witnesses referred to the fact that the defendant was served with a capital murder indictment after he refused to disclose the location of the victim's body. The defendant testified that he was threatened with the death penalty if he did not confess. On this appeal, he challenges the admissibility of the other statements he made on July 21, contending that the threat of the death penalty rendered all statements on that day involuntarily coerced.
Although the testimony given by Galanos at the first trial is not in the record of the instant proceedings, we have examined the record on the former appeal "to ascertain the issues of law and fact there involved, and the result, and the influence of such adjudication on the questions presented in the appeal under consideration," Crossland v. First National Bank,233 Ala. 432, 434, 172 So. 255, 256 (1937); accord, Griffin v.Proctor, 244 Ala. 537, 542, 14 So.2d 116, 119 (1943), namely whether the defendant's statements were involuntarily coerced by the alleged threat of the death penalty.
[4] By July 20, Derenda Henderson had given the police three "statements." Although the statements are not in the record, defense counsel elicited from Sergeant Boone the fact that the first was 4 pages long, the second was 14 pages long, and the third was 21 pages long. Boone agreed it was a "fair statement" to say that each time Ms. Henderson talked to the police, "she recalled more and more events." The conclusion is clear that the "events" she recalled were those she claimed the defendant related to her about Christina Zane's murder.