640 So.2d 1025 (1992)
Willie Simmons JACKSON, alias Willie S. Jackson, alias Billy Boy Jackson
v.
STATE.
4 Div. 388.
Court of Criminal Appeals of Alabama.
August 21, 1992.
Rehearing Denied November 25, 1992.
*1028 Paul Young, Enterprise, and Jackson W. Stokes, Elba, for appellant.
James H. Evans, Atty. Gen., and Cecil G. Brendle and Sandra J. Stewart, Asst. Attys. Gen., for appellee.
McMILLAN, Judge.
The appellant was charged in a 10-count indictment with capital murder, in violation of § 13A-5-40(a)(2), Code of Alabama 1975; four counts of forgery in the second degree, in violation of § 13A-9-3, Code of Alabama 1975; and four counts of possession of a forged instrument in the second degree, in violation of § 13A-9-6, Code of Alabama 1975. Following his trial, the appellant was convicted of the capital offense of murder during a robbery and four counts of forgery in the second degree. Following the sentencing hearing before the jury, the jury recommended a sentence of life imprisonment without parole, by a vote of seven to five. A separate sentencing hearing was then held before a judge, and the appellant was sentenced to 4 consecutive 15-year terms for the forgery convictions, and the judge, overriding the jury's recommendation, sentenced the appellant to death for his capital murder conviction.
In his sentencing order, the trial judge included the following facts:
"The Court finds, beyond a reasonable doubt, that on the morning of July 5, 1987, the victim, Elmo B. Roberts, was at his home located at 1019 North Claxton Avenue, Elba, Alabama. At approximately eight o'clock that morning, the eighty-seven (87) year old man was sitting alone in the den of his very small apartment.
"The Defendant called the victim to the apartment door and requested to come inside to visit with the victim. The victim had previously come to know the Defendant by casual meetings at downtown Elba, Alabama, where the victim had helped the Defendant by giving Defendant rides to several locations around town. *1029 The victim, knowing Defendant, told Defendant to come in and to have a seat. Defendant came in, sat in a chair and told the victim that he (the Defendant) was very hot. Accommodatingly, the elderly victim got up and positioned a fan so as to cause it to blow on Defendant. The Defendant got up contending Defendant needed to use the bathroom. Defendant then proceeded toward the bathroom door of the small apartment and picked up a laundry iron that was used by the victim as a doorstop. The Defendant then viciously struck the victim in the head several times with the iron. The victim was beaten to the floor where he helplessly lay. Defendant then obtained a pair of scissors that were used by Defendant to cut and to slash the elderly victim's wrist and throat and the jugular-vein area. Even after all of this had occurred, the victim was observed by Defendant to be sufferingly alive. Taking a broom, Defendant struck the broom handle to the throat area of the victim with such impact that the broom handle broke. In his confession, which is part of the Record, the Defendant, referring to the victim said, `I didn't want him to suffer.' The Defendant then robbed the victim of fifty-five ($55.00) dollars from the victim's person and also took a personal checkbook from the very small apartment's kitchen counter, which was located within ... view of where the victim's blood-soaked body lay. Beyond a reasonable doubt, the intentional murder of this victim was committed by the Defendant during and for the purpose of accomplishing the robbery of the victim. The capital offense was committed while the Defendant was engaged in the commission of robbery of the victim, Elmo B. Roberts, in the Elba division of Coffee County, Alabama.
"After accomplishing the capital offense, the Defendant fled the scene, taking with him certain of the victim's personal checks. Later that same day and in the Elba division of Coffee County, Alabama, Defendant forged four separate checks drawn on the victim's personal checking account, cashing them on separate occasions at a local eating establishment in Elba, Alabama. As the spotlight began to focus, Defendant was brought to the police station for questioning. He was advised of his rights and made knowledgeable, intelligent and voluntary waivers of those rights. Initially denying any participation in the crimes, Defendant made a knowing, voluntary and intelligent confession some two days after Defendant had first been questioned. The confession was taped and was reduced to writing. The taped confession was admitted into evidence and was heard by the Court and by the jury at trial.
"Dr. Alfredo Paredes, a Board Certified Forensic Pathologist, testified that the victim died as a result of multiple, blunt/sharp force trauma to the head, neck, and upper extremities with evidence of hemorrhagic shock, secondary laceration of the large blood vessels of the left side of the neck with circumstantial evidence of exsanguination. Dr. Alfredo Paredes further testified that in his expert opinion the victim suffered substantial pain before ultimately dying."

I
The appellant argues that the trial court erred in failing to exclude the State's evidence at the close of its case-in-chief, because, he says, the State failed to present sufficient evidence to prove every element of the offenses charged. The appellant also alleges as error the trial court's use of the word "scintilla," in denying the appellant's motion for judgment of acquittal. These allegations raised by the appellant will be addressed as three subissues: whether sufficient evidence was presented to sustain the appellant's capital murder conviction; whether sufficient evidence was presented to sustain the appellant's forgery convictions; and whether the trial court's use of the word "scintilla" constituted reversible error.

A
The appellant argues that the evidence presented by the State did not sufficiently link him to the commission of the capital murder. The record indicates that, before resting its case, the State presented evidence concerning the facts surrounding the victim's death, including the theft of certain checks *1030 and cash and the cause of his death. The State also introduced into evidence the appellant's statement, in which he confessed to having committed the offense and stated the details of the act. The State presented evidence, through the testimony of the victim's son and a bank employee, that the appellant was not authorized to write checks on the victim's account. Evidence was also introduced that only three parties were so authorized. The bank employee also testified that he recognized the signature on one of the checks cashed by the appellant as a forgery and that he had compared the signature on that check to the authorized signatures on the signature card related to the account on which the check was written, which was kept by the bank. The State also presented testimony from an employee of Hardee's restaurant that she had accepted one of these forged checks in the amount of $20, which was more than the amount of the purchase, from the appellant. She was also present when the appellant presented another check for payment in an amount over the purchase price at the restaurant. Four checks were cashed by the appellant at Hardee's restaurant. The witness further testified that she deposited the four forged checks, each made out to "Hardee's" for $20. She testified that the appellant was a regular customer and that he appeared to be in a hurry when he presented the check to her on the day of the offense. An examiner of latent fingerprints testified that she examined the four checks and compared them to the appellant's fingerprint card from the Coffee County jail, and that she found latent prints belonging to the appellant on three of the four forged checks. Moreover, the State presented evidence that a partially burned checkbook was found at the appellant's residence.
"`"The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821 (1969). Even though an appellate court should "marvel that a jury would convict upon such flimsy proof," it is "not permitted to pass upon the weight or sufficiency of the evidence, where it may yield any rational inference of guilt." Toles v. State, 170 Ala. 99, 100, 54 So. 511 (1911). A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the State to support a verdict it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' Granger [v. State, 473 So.2d 1137, 1139 (Ala.Cr.App.1985) ].
"Where a defendant's conviction is based solely on circumstantial evidence, `if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed.' Ex parte Brown, 499 So.2d 787, 788 (Ala.1986) (emphasis in original). `Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). `Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, *1031 Ex parte Cochran, 500 So.2d 1179 (Ala. 1985). `It is not necessary for a conviction that the defendant be proved guilty to the "exclusion of every possibility of innocence." `Burks v. State, 117 Ala. 148, 23 So. 530 (1898). `The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.' Howard v. State, 108 Ala. 571, 18 So. 813, 815 (1895)."
White v. State, 546 So.2d 1014, 1017 (Ala.Cr. App.1989).
The evidence presented by the State was sufficient to sustain the appellant's conviction of the capital offense of intentional murder during a robbery.

B
The State also presented sufficient evidence to support the appellant's four convictions of forgery in the second degree. The record indicates that the appellant was initially indicted for the offense of forgery in the second degree and criminal possession of a forged instrument in the second degree as to each forged check. However, after all of the evidence was presented, the State nol-prossed the charges of criminal possession of a forged instrument in the second degree. According to § 13A-9-3, Code of Alabama 1975:
"(a) A person commits the crime of forgery in the second degree if, with intent to defraud, he falsely makes, completes or alters a written instrument which is or purports to be, or which is calculated to become or represent if completed:
"(1) A deed, will, codicil, contract, assignment or a check, draft, note or other commercial instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status ..."
The State presented evidence that the appellant was not authorized to write checks on the victim's account. The State also presented evidence that the four checks, although purporting to contain the victim's signature, actually contained forgeries of the victim's signature. There was testimony that the appellant presented one of these checks for $20 to an employee of Hardee's restaurant in payment of a food purchase and that the other three checks were also presented to Hardee's on the same day and for the same amount. The State also presented evidence that the appellant's fingerprints were found on three of the four checks. Thus, the State presented sufficient evidence to support the appellant's convictions of forgery in the second degree. See Burke v. State, 478 So.2d 6 (Ala.Cr.App.1985), overruled on other grounds, Turner v. State, 584 So.2d 925 (Ala. Cr.App.1991). See also Brown v. State, 314 So.2d 917, 920 (Ala.Cr.App.1975) (upholding conviction of forgery in the second degree under predecessor statute, Code 1940, Title 15, § 389); Jones v. State, 53 Ala.App. 497, 301 So.2d 260 (Ala.Cr.App.1974) (sufficient evidence to sustain conviction of first degree forgery under predecessor statute, Code 1940, Title 14, § 199); Simmons v. State, 55 Ala.App. 679, 318 So.2d 374 (1975) (sufficient evidence to uphold forgery of a blank check under predecessor statute for forgery in the first degree); Powers v. State, 333 So.2d 205 (Ala.Cr.App.1976) (sufficient evidence to support conviction of forgery of a check under forerunner statute for forgery in the first degree.)

C
The appellant argues that the trial court's reference to the scintilla rule constituted reversible error. The record indicates that at the close of the State's case the appellant made a motion for judgment of acquittal and to exclude the State's evidence. In ruling on the appellant's motion to exclude the State's evidence, the trial court stated:
"Okay. It's been at least some evidence, scintilla of evidence as to each and every allegation set forth. Motion is denied."
There was no objection made by the appellant on this ground until an amended motion for new trial was filed.
The "scintilla" rule, which is no longer applicable in civil cases, has never been applicable in criminal cases, Adams v. State, 459 *1032 So.2d 999 (Ala.Cr.App.1984); the standard of proof in criminal cases is beyond a reasonable doubt. However, in the present case, as determined in subsections A and B of this issue, supra, sufficient evidence was presented by the State to support the charged offenses under the proper standard of proof. Thus, this improper statement by the trial court was harmless. Cf. Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (instruction by the trial court to the jury that impermissibly shifted the burden of proof as to an element of the crime to the appellant, in violation of his rights to due process, is subject to the harmless error rule). Cf. also Kentucky v. Whorton, 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979) (presumption of innocence charge, required under Taylor v. Kentucky, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), is not required in all cases.)
In Smiley v. State, 376 So.2d 813, 814-15 (Ala.Cr.App.1979), this court held:
"We agree with the conclusion of the trial court in overruling defendant's motion to exclude the evidence on the ground that a `mere scintilla of evidence in view of the presumption of innocence is insufficient.' The trial court aptly said:
"`... There's more than a scintilla of evidence here. The mere statement of this Defendant standing alone might fall under that category, but when you have witnesses to take the stand and do violence to that statement of the Defendant by saying that he and Johnny Lee Scruggs, after the fire, went around looking for Otney, that coupled with evidence about buying the shotgun shells and so on, I think makes a sure question out of it. This jury could find that Johnny Lee Scruggs was the principal movant, in this thing, but this man aided and abetted him with knowledge of everything Johnny Lee Scruggs was going to do and in fact did do.
"`I just feel this is something I can't take away from the jury. I would be invading their province to overlook that much evidence. The motion will be overruled.'"
Thus, even though the trial court stated and, apparently applied, the improper standard for the evidence which must be established by the State, it is clear that under these facts there was sufficient evidence presented to warrant the submission of the cases to the jury for its consideration. Rule 45, Alabama Rules of Appellate Procedure.

II
The appellant argues that the trial court committed reversible error by failing to quash the jury venire after more than two-thirds of the venire allegedly failed to give practical application to the presumption of innocence. However, a review of the entire voir dire questioning of the potential jurors regarding the presumption of innocence reveals that only one potential juror, who was excused for cause, indicated that she could not accept and apply that presumption in this case. In his argument, the appellant refers to the fact that, during this questioning, defense counsel asked the panels how many of them would vote to "acquit" the appellant prior to hearing any evidence. The appellant argued that of the 5 jury panels questioned, ranging in number from 14 to 20 members per panel, only 8 potential jurors indicated that they would acquit the appellant. However, prior to this questioning, the trial court instructed and questioned each panel concerning the presumption of innocence and every potential juror, with the one exception, indicated that he or she would accept and follow the presumption. The prosecutor also questioned most of the panels concerning this presumption, with the jurors indicating that they would apply the presumption of innocence. Thereafter, the appellant moved to quash the venire on these grounds, and the trial court denied the motion, stating as follows:
"The Court finds that the jurors or veniremembers who were asked this question and who did not raise their hand because of the limiting instructions they were given were confused. It was obvious to the Court thatfrom watching their reactions that they were confused. And on many instances as we interrogated each panel, when they were clarifiedmore clarified, provided more information, many *1033 who did not raise their hand later said that there would have to be a presumption of innocence. And when they were given more full instructions, began raising their hands that they would presume the defendant innocent as the term was put to them at this stage without any basic further testimony and that they would abide by that. Everyone of the jurors except for one advised the Court that, when interrogated, that they would give this defendant a presumption of innocence that he is entitled to and that they made that known to the Court by failure to raise their hands except for one member; and then when later questioned by defense counsel, failed to raise their handsmany of them did. But this Court finds that full and adequate instructions were not provided the venire panels and that they were confused when they were asked this question by defense counsel. More adequate instructions on this would certainly be provided the final jury in this case relating to presumption of innocence. And, of course, after that time, we will have taken testimony, there will be evidence before the jury, the final jury from which they can base a verdict. And I find that these panels in many cases were confused because they had no evidence from which they should base a verdict and they were unclear that their verdict should be not guilty because of this presumption of innocence. I don't think that was completely made clear to them. And the Court will bend over backwards in its charge to the jury to make sure that they fully understand the presumption of innocence and that the defendant is to be accorded this presumption of innocence until convinced beyond a reasonable doubt and to a moral certainty of the guilt of any charge with which this defendant stands before this Court at this time."
Thereafter, the trial court fully instructed the actual jury as to the presumption of innocence during its oral charge to the jury.
A review of the record indicates that the potential jurors were confused both by the term "acquit" and by the method of questioning employed by this defense counsel; i.e., attempting to question them as to how they would vote on the appellant's guilt, if they had to so vote before the trial. It should be noted that this questioning followed questions concerning pretrial publicity. Based on an overall review of the record, we find no error in the trial court's denial of the appellant's motion to quash the venire based on this ground.

III
The appellant argues that the trial court abrogated its judicial responsibility and denied the appellant his rights to due process and equal protection by denying the appellant's motion to quash the jury, upon learning that the trial judge had allowed his secretary to excuse potential jurors. The record indicates that, during a hearing on the appellant's motion to quash the jury venire, it was learned that a number of potential jurors had called the clerk's office concerning their summonses. They had then been referred to the judge's secretary, who had excused them from jury service. The judge's secretary was called to testify and stated that she had been given a list of reasons for which people could be excused from jury service, which she had followed during the entire time of her employment as the judge's secretary. Thereafter, she was called upon to list the potential jurors who had been excused and the reasons for which they were excused. The following transpired during this hearing:
"THE WITNESS:
Number 1, H.K.A., physically unable. Number 2, D.
"THE COURT:
Do you know why [he] was physically not able?
"THE WITNESS:
(shaking head)
"THE COURT:
What else?
"THE WITNESS:
"Number 2, Dykes B. Adkison, lives in Enterprise district. Number 7 Perry O. Ballard lives in Covington County. Number 12 Rachael E. Boden, physically unable. Number 17, Joy H. Brooks, physically unable. Number 27, Gerald R. Carnley, lives in Covington County. Number *1034 29, Fred Carpenter, physically unable. Number 46 Donald C. Danford, lives in Texas. Number 49, Johnny S. Daniels, lives in California. Number 50, Kenneth Daniels, lives in Millbrook, Alabama. Number 61, Grace P. Driggers is physically unable. Number 73, David M. Fletcher, lives in Covington County. Number 78, Gathel B. Foley lives in Covington County. Number 90, Will D. Hammett, physically unable. Number 93, Carolyn D. Hattaway, physically unable. Number 94, Gerald L. Hattaway, physically unable. Number 106, Darren C. Johnson, lives in Germany. Number 109, Paula R. Johnson, lives in Houston County. Number 114, Carolyn H. Cramer, lives in Maryland. Number 119, Dorothy N. Lindsey, physically unable. Number 121, Jimmy G. Maddox, physically unable. Number 124, James H. Matthews, physically unable. Number 134, William F. Moody, physically unable. Number 135, Deborah S. Moore, lives in Dale County. Number 141, Clinton C. Patterson, lives in Covington County. Number 147, Sidney R. Pridpridgen lives in Geneva County. Number 148, Estelle B. Rainey, physically unable. Number 151, Carlton E. Rhodes, physically unable. Number 152, Carter C. Rhodes, physically unable. 158, Eugene Sawyer lives in Pike County. Number 171, Annie R. Spicer, served last criminal jury term. Number 173, Walter N. Stankey lives in Covington County. Number 174, Hinton Stewart, physically unable. 182, Theresa C. Trawick, lives in Pike County. Number 183, David W. Turnage, lives in Ohio. Number 185, Samantha J. Waddell, lives in Dale County. Number 189, Jimmy D. Weeks, lives in Geneva County. Number 191, I.D. Whitman, physically unable. Number 197, Howard Wood, lives in Covington County. That's all.
"THE COURT:
As far as those you listed as being physically unable, did they tell you whywhat their physical disability was or why they are unable?
"THE WITNESS:
Yes, sir.
"THE COURT:
Are you saying that you jotted all that information down or you did not?
"THE WITNESS:
"No, sir, I did not."
Thereafter, the district attorney argued that, pursuant to § 12-16-74, Code of Alabama 1975, the court may in any case, including capital cases, exclude or postpone the service of a potential juror outside the presence of the parties and their counsel. He further argued that, pursuant to § 12-16-63, Code of Alabama 1975, a person may be excused from jury service by the court for a period of time that the court deems necessary upon a showing of undue hardship, extreme inconvenience, or public necessity. The district attorney further argued that the law in Alabama requires that a minimum of 36 potential jurors be included in a capital case, and that even with the excluded jurors, there were still 118 jurors from which to select a jury. The trial court then denied the appellant's motion stating as follows:
"... Of course this Court has not officially excused anyone at this point in time from this venire. My right arm person, who is my secretaryand she is for that reason classified under Alabama law as a confidential employee, a confidential secretary. And that has a significance in and of itself. This Court finds that we have a military base partially in Coffee County, this countyCoffee County, and that many members of the militaryunfortunately some members of the military come and they go and some stay. And many buy driver's licenses here at this courthouse and in the courthouse in Enterprise, Alabama, which is also in Coffee County. We have got two courthouses here in this county, for the record, the Elba Division, in which this case will be tried; and the Enterprise Division of Coffee County.
"It's obvious from a list of people who do not live now in Elba Division of Coffee County, Alabama, that some of these people on this venireand I have at least three or fourare apparently, from their present addresses, consideredare probably military personnel....
". . . .

*1035 "As far as those names who have been removed from the venire by the clerk of the court throughreturned from the postal system or otherwise, this judge has not removed anyone officially at this time. Those names are hereby ordered removed for lack of servicethe twenty-five returned by the postal system. As far as those that have been enumerated by my secretary here in open court, they are hereby officially removed from the venire.
"... This court finds that only thirty-six veniremembers are required under Alabama law to appear in this courtroom and be present for the selection of a jury of fourteen as is required by Alabama law in a capital matter. The Court finds that if you take out everyone who has been testified to, we have in excess of 110, most likely 118 veniremembers who remain. This Court has instructed the clerk to take additional efforts to ensure that more than the requisite number were drawn or requisitioned from the State and that's been done. The Court did that anticipating that some would not show up for trial, as is normal at any court session or jury session that this Courtthis Judge has presided over."
Only the trial court could properly excuse these potential jurors pursuant to § 12-16-63, Code of Alabama 1975, which states:
"(a) The court, upon request of a prospective juror or on its own initiative, shall determine on the basis of information provided on the juror qualification form or interview with the prospective juror or other competent evidence whether the prospective juror should be excused from jury service. The jury commission shall enter this determination on the juror qualification form and the master list.
"(b) A person who is not disqualified for jury service may be excused from jury service by the court only upon a showing of undue hardship, extreme inconvenience or public necessity, for a period the court deems necessary, at the conclusion of which the person may be directed to reappear for jury service in accordance with the court's direction."
The trial court's statement during the hearing, that it had not actually excused any of these potential jurors at that time, and his ruling in excusing them, pursuant to § 12-16-63, Code of Alabama 1975, served only to mask the error. However, in light of the reasons given by the jurors who were excused and the number of jurors remaining on the panel prior to voir dire, no reversible error occurred. Cf. Russaw v. State, 572 So.2d 1288, 1294 (Ala.Cr.App.1990).

IV
The appellant argues that the trial court erred in denying his objection, based on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), after the prosecution allegedly failed to give race-neutral reasons for striking blacks from the jury. The appellant also argues that the trial court should have sustained his objection, because the prosecutor announced that he struck an identifiable class of prospective jurors based on their age.
The appellant, a black male, raised this objection in a timely manner and alleged that the prosecutor struck all but one black from the jury panel. The record indicates that one black served on the jury and a second black served as an alternate. Of its 35 strikes, the State used 9 to remove blacks from the jury and further used its last strike against the black alternate. In his Batson motion, the appellant listed the prosecutor's strikes against blacks as follows: his second strike, his sixth strike, his eighteenth strike, his twenty-first strike, his twenty-sixth strike, his twenty-eighth strike, his thirtieth strike, his thirty-first strike, and his thirty-fourth strike. Thereafter, the trial court made the following finding:
"All right. First of all, I find that there is no systematic exclusion shown at this time which would result in a presumption. There is one black person on this jury for sure. There is an alternate. Out of an abundance of precaution, this Court will require at this time the District Attorney to present reasons for striking each and every person that he in fact struck which was of the black race."
*1036 The district attorney gave race-neutral reasons for all of his strikes against blacks. The last strike, which resulted in a black alternate, was struck because the prospective juror was a second cousin to one of the defense attorney's secretaries; and he stated that he knew another of the defense attorneys. The potential juror also stated that he had known the defendant all of his life. Acquaintance with a defendant or his family has been previously held to be a race-neutral reason for a strike. Jackson v. State, 549 So.2d 616 (Ala.Cr.App.1989).
As to the next black that was struck, the prosecutor stated that his office had prosecuted and convicted the potential juror for assault and battery. Moreover, the potential juror had indicated that jury service would create a hardship for him because he had recently resumed work and was to begin the week of trial. A prior criminal record has been held to be a racially-neutral reason for striking a juror. Ward v. State, 539 So.2d 407 (Ala.Cr.App.1988); Wagner v. State, 555 So.2d 1141 (Ala.Cr.App.1989). Additionally, this potential juror had indicated that he had known the defendant for a long time, and being an acquaintance with an accused has been held to be a valid race-neutral reason for a strike. Jackson v. State, supra.
The next black potential juror was struck because a charge of driving under the influence was pending against him in district court. The district attorney indicated that his office was prosecuting the case and that the potential juror had, on prior occasions, failed to appear; therefore, a "failure to appear warrant" had been issued for him. Such a reason has been held to be race-neutral. Strong v. State, 538 So.2d 815 (Ala. Cr.App.1988). This potential juror also stated that he had known the defendant for a long time. Jackson v. State, supra. During the discussion of the reasons for striking this potential juror, the prosecutor also stated that "the State had decided that he [the potential juror] fell into a category of people that we [the State] were trying to strike; and that is, the younger folk on this jury venirenot because of his race, but all of them." Although age has been held to be suspect as a reason, Ex parte Bird, 594 So.2d 676 (Ala.1991), because the prosecutor also gave reasons that were racially neutral this reason need not be addressed. See Davis v. State, 555 So.2d 309, 314 (Ala.Cr.App.1989) (wherein the prosecutor gave age as a reason for his strike, which was acknowledged as being suspect, but this court held that, "[w]e do not need to address whether this strike was a sham, however, since the prosecutor stated an additional ground for striking this veniremen," which was held to be sufficiently race-neutral). See Clark v. State, 621 So.2d 309 (Ala.Cr.App.1992). See also Steeley v. State, 622 So.2d 421 (Ala.Cr.App.1992) (wherein this court held that, "[a]lthough age has been held to be a `highly suspect' reason, Ex parte Bird, 594 So.2d 676 (Ala.Cr.App. 1991), the prosecutor in the present case demonstrated that he had struck white veniremembers based on the same reason") Fisher v. State, 587 So.2d 1027 (Ala.Cr.App.), cert. denied, 587 So.2d 1039 (Ala.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992) (age held to be race-neutral reason where juror's children were approximately the same age and the court noted that white veniremembers with children the same age were also struck).
The next black potential juror was struck because he had been convicted of a violation of the prohibition law and of gaming; such a reason has been held proper. Jackson v. State, supra. Moreover, this potential juror also stated that he had been a client of the defense counsel's and this court has held that, where a potential juror was a former client of defense counsel, the juror was struck for a valid race-neutral reason. Lewis v. State, 535 So.2d 228 (Ala.Cr.App. 1988). Furthermore, this potential juror stated that he knew the defendant and had conducted business with him in the past. Such a reason is sufficiently race neutral. Avery v. State, 545 So.2d 123 (Ala.Cr.App. 1988).
Another black potential juror was struck because she had been convicted of passing a worthless check, which the prosecutor noted was a crime involving moral turpitude. Jackson v. State, supra. Another *1037 potential black juror was struck because he indicated that he was close friends of the defendant and the defendant's family and, for this reason, he did not want to serve on the jury. Jackson v. State, supra; Avery v. State, supra. The striking of a veniremember who expressed that he did not want to serve on the jury has been held to be a legitimate, non-discriminatory reason for strike. McGahee v. State, 554 So.2d 454 (Ala.Cr.App.), affirmed, 554 So.2d 473 (Ala. 1989).
The next potential black juror was struck because he stated that he was a next-door neighbor of the defendant and that he had known him all of his life. Jackson v. State, supra; Avery v. State, supra. He also stated that he had used defense counsel as his attorney. Lewis v. State, supra. Moreover, he stated to the court that he did not want to sit on the jury, and expressed some reservations about his ability to be fair and impartial. McGahee v. State, supra.
The next potential black juror was struck because she stated that she had health problems, specifically that she was a diabetic and that she had to take medication. She indicated that she did not want to sit on the jury for that reason. McGahee v. State, supra. She also stated that she knew the defendant. Jackson v. State, supra; Avery v. State, supra.
The last potential black juror was struck because she stated that she has a close relationship with the defendant's sister and mother. McGahee v. State, supra; Avery v. State, supra. Moreover, she expressed strong opposition to the death penalty. Id.
The trial court held that the reasons given by the district attorney's office were all sufficiently race neutral, that they were not "contrived to avoid admitting acts of group discrimination," and that there was no disparate treatment of any cognizable class.
"[W]e note that `the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.' Batson, supra, 476 U.S. at 97, 106 S.Ct. at 1723. It is within the sound discretion of the trial court to determine if the State's peremptory challenges of black jurors are motivated by intentional racial discrimination. Ex parte Jackson, 516 So.2d 768 (Ala.1986). Moreover, the trial court's findings as to whether the defendant has established purposeful racial discrimination are to be accorded great deference on appeal, Batson, supra, 476 U.S. at 98, 106 S.Ct. at 1724, and should be reversed on appeal only if they are clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala.1987)."
Ex parte Lynn, 543 So.2d 709, 712 (Ala.1988).
"Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries. See Davis v. State, 555 So.2d 309, 312 (Ala.Cr.App.1989).
"While trial judges should not `lightly brush ... aside' an accused's Batson claim or `require a strict or rigid quantum of proof' Harrell [v. State, 555 So.2d 263, 268 (Ala.1989)], an appellant still must make some showing that the prosecutor used his peremptory strikes in a purposefully discriminatory manner."
Parker v. State, 571 So.2d 381, 384 (Ala.Cr. App.1990). See also McGee v. State, 594 So.2d 219 (Ala.Cr.App.1991). We find no purposeful discrimination by the district attorney in his striking of black potential jurors.
As to the appellant's claim that the prosecutor's statement of his policy of striking a certain age group, specifically a young age group, from the venire constituted a violation of Batson v. Kentucky, supra, we can find no authority to support the appellant's contention that the Batson principles should apply to such a class. However, it should be noted that the prosecutor responded to the appellant's allegations, stating:
"Rebuttal argument, Judge. I did not say that we struck everybody of a young age. I said that is one of the things that we were looking at in selecting this jury. We can point out to the Courtwe would point out to the Court we have a Juror Number 195 that is twenty-four years of *1038 age. We have a Juror Number 59 that is thirty-six years of age. We have a Juror Number 22 that is twenty-nine years of age. We had no conscious plan to strike anyone on account of race, creed, color or sex or age. That is the argument."
Thus, the prosecutor responded that there was no intent to strike specifically according to age, and because young people served on the jury, there is no evidence to the contrary.

V
The appellant argues that an adequate appellate review cannot be had of this case, because the record is incomplete. Specifically, the appellant alleges that a micro-cassette tape, which was entered into evidence and played to the jury during the trial, is missing and therefore adequate appeal from this case cannot be taken. A hearing was held on this matter, during which the circuit court clerk testified that he received custody of the exhibit, which was sealed and placed in a walk-in vault. Several weeks after the flood in Elba, which occurred in March 1990, it was discovered that this exhibit was missing, and attempts to recover it had been unsuccessful. It was noted that a transcript of the tape had been submitted as a pretrial exhibit and marked as State's exhibit number 1. During the motion to suppress the appellant's statements, one of which was contained on the micro-cassette,[1] Bruce DeVane, who interviewed the appellant and operated the tape recorder, testified that State's exhibit number 1 was a true and accurate transcription of the recording. Following the hearing on the appellant's motion to correct the record, the trial court held that this motion was premature, because Rule 13, A.R.App.P., had not been complied with. However, the trial court further held that the record was complete and in proper form for submission to this court.
The United States Supreme Court has held that, unless a criminal defendant shows bad faith on the part of the police in failing to preserve evidence that might have been useful to the defendant, the failure to preserve does not constitute a denial of due process of law. Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In the present case, where an accurate transcription of the missing tape was admitted at trial and is available on appeal, any potential usefulness of the missing micro-cassette tape is dubious.
"Where the use in evidence of typewritten transcripts of sound recordings has been objected to as in violation of the best evidence rule, the general rule is that the typewritten transcripts have been held admissible in evidence if their accuracy and reliability is clearly established. 29 Am. Jur.2d Evidence, Section 436 (1967); Annot. 58 A.L.R.3d 598 (1974). Since the accuracy and reliability of the transcript was adequately established, we find no error in its admission into evidence."
Hawkins v. State, 443 So.2d 1312, 1315 (Ala. Cr.App.1983).
This court has reviewed the transcript of the appellant's statement, and has further closely scrutinized the extensive testimony concerning this statement contained in the record during the pretrial suppression hearing, wherein the subject matter and statements contained in the tape were questioned, examined, and analyzed in depth. The record as to this matter is sufficient for appellate review.

VI
The appellant argues that the trial court erred to reversal in allowing into evidence a statement made by the appellant during custodial interrogation because the appellant repeatedly asked to stop the interrogation. The record indicates that the appellant made four statements, two of which occurred on the same and final day of questioning, and all of which were recorded by the police and transcribed. The appellant did not clearly admit guilt for his role in the offense until the final statement. As is alleged by the appellant, a review of these statements and the suppression hearing testimony clearly indicates that the appellant *1039 sought to end the interrogation on numerous occasions during the first three interrogations to no avail.[2] However, because the appellant did not confess or prejudice himself until the fourth statement, and because an intervening circumstance led to the fourth statement, there was no error pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).
The record indicates that there was approximately a 45 minute interval between the appellant's third and fourth statements. Immediately following the third statement, the appellant was taken into the lobby of the police station, where he observed a friend who had apparently walked down to that area of the police station in order to talk to him. Both the appellant and his friend requested to speak to each other privately, but one of the investigators refused that request and responded that they could speak to each other in the lobby. Although no one present was able to completely overhear the conversation, apparently the appellant's friend attempted to implicate a third party in the commission of the offense and the appellant became agitated. The appellant turned to one of the investigators and stated that his friend was lying and that he wanted to give a complete and accurate account of what had transpired. Thereafter, the appellant was again advised of his Miranda rights and was taken back into the room where he was interrogated. The appellant then confessed to the facts and circumstances of the offense as well as his role therein. Although the circumstances behind the presence of the appellant's friend at the police station are questionable,[3] there is no indication in the record that she was brought there by any official in order to obtain a confession.
The appellant argues that the earlier statements were obtained in violation of Miranda v. Arizona, supra, in that he had invoked his right to silence, and were therefore not involuntary. However, he apparently argues that the "fruit-of-the-poisonous-tree" doctrine still pertains to the last statement. "Although the lower courts have generally held or assumed that the fruit-of-the-poisonous-tree doctrine is applicable to cases involving confessions obtained in violation of Miranda, the matter remains in some doubt because of the fact that the Supreme Court has not spoken to the issue unequivocally." LaFave and Israel, 1 Criminal Procedure, § 9.5(a) (1984).
Even assuming that the fruit-of-the-poisonous-tree doctrine is applicable to cases where a prior confession is obtained in violation of Miranda v. Arizona, supra, no error would be present under these circumstances, because the initial, allegedly tainted statements were exculpatory and the properly obtained statement was inculpatory. "Where both [statements] are inculpatory in nature, then `despite Miranda warnings that intervened between two confessions, the accused may attach no importance to its restatement,' but the situation is different when the first statement was exculpatory and thus a finding that the taint is dissipated is more likely in such a case." LaFave and Israel, Criminal Procedure, supra, at § 9.5(c), quoting United States v. Trabucco, 424 F.2d 1311 (5th Cir. 1970), cert. denied, 399 U.S. 918, 90 S.Ct. 2224, 26 L.Ed.2d 785 (1970).
In Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court held that, where a legally *1040 obtained confession follows an illegally obtained confession, the situation should be examined by weighing the following factors: temporal proximity, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. In the present case, although only approximately 45 minutes passed between the pertinent statement and the last of the allegedly illegal statements, there were clear intervening circumstances that prompted the pertinent statement. Moreover, as previously stated, there is no indication in the record that the appellant's friend was at the police station as a result of official misconduct. Therefore, we find no error in the admission of the appellant's confession at trial.

VII
Pursuant to the plain error rule, in Rule 45A, A.R.App.P., this court has searched the record in order to determine if any error occurred which "has or probably has affected the substantial right of the appellant." We find three matters worthy of discussion that were not raised in briefs on appeal: whether a comment made by the prosecutor, during his closing argument to the jury at the guilt phase, which concerned the advisory nature of the jury's verdict, constituted plain error; whether the appellant was unduly prejudiced by any conflict of interest arising from the fact that the officer who prepared the presentence investigative report relied on by the trial court in overriding the jury's advisory verdict and sentencing the appellant to death was the wife of the chief assistant district attorney in this case[4]; and whether the trial court acted properly in declaring § 22-50-22, Code of Alabama 1975, unconstitutional.

A
The record indicates that, during the prosecutor's closing argument to the jury at the guilt phase of the appellant's trial, the following transpired:
"[PROSECUTOR]: The decision of whether or not, if you find this defendant guilty of the capital charge, as to punishment of him is not up to you.
"[DEFENSE COUNSEL]: Objection.
"THE COURT: Sustained.
"[DEFENSE COUNSEL]: Motion for mistrial.
"THE COURT: Ladies and gentlemen of the jury, you are to disregard that last response. It was not proper, and I told you at the outset of this case that what attorneys tell you is not evidence in this case. The Court will instruct you as to the law.
"[PROSECUTOR]: Ladies and gentlemen, thein a capital case, the sentence of a particular defendant, as in any criminal case, will be the final decision made by this Judge here.
"[DEFENSE COUNSEL]: Objection. Motion for a mistrial.
"[PROSECUTOR]: May it please the Court
"THE COURT: I do not want to hear any more comments on that. Motion denied.
"Ladies and gentlemen of the jury, you are instructed to disregard that last comment by [the prosecutor]; it's not proper. The Court will instruct you as to the law in this case, not the District Attorney or any other attorney."
Thereafter, during the trial court's instructions to the jury, the trial court stated as follows:
"The Court does hereby further instruct you that in any deliberations in this case and in any verdict or verdicts that you may render in this case, you are instructed not to consider anything that was objected to which objection was sustained by this Court. It's this Court's job to explain the law to you. It's the Court's job to explain the procedure to you. It's not an attorney's job to do that.
". . . .
"You are not to concern yourself at this time, ladies and gentlemen of the jury, with any issue of punishment."
Following the return of the jury's verdict of guilt as to the charged offenses, defense *1041 counsel again moved for a mistrial on the grounds of improper prosecutor trial comment. The following transpired:
"[DEFENSE COUNSEL]: And we, as attorneys for the defendant, feel very strongly that the remarks made by [prosecutor] in his closing to the jury regarding their function or lack thereof as far as sentencing of this defendant were so prejudicial as to be incapable of being eradicated. And for that reason, we move the Court for a mistrial at this point as well because now the next phase is to have the same jurors (that he may have had these comments) to decide the fate of this man under the statute and they have been told that what they do is of no consequence.
". . .
". . .
"THE COURT: Okay. Just forany further response as to those? Just for the record, I think it's important that I explain myself as to my ruling in this particular regard. First of all, there was a comment by defense counsel to the jury. It went substantially like this: Ladies and gentlemen of the jury, you are called on to there was some indicationto decide the fate of and kill this person. The State may have an argument and have been in a position to make its statement to this jury the statement that it made in rebuttal or in response to that comment by defense counsel. However, I felt that it was inappropriate and I sustained the objections, both objections, and I gave the jurors instructions to disregard the counsel's for the State's comments, that it was the Court's job to explain procedures and the law to the jurors, that it was not counsel's job to do that.
"I find that the jurors were in no way tainted by any statements that were made in closing remarks by counsel for the State. That wasthat curative instruction was given by the Court in a very timely manner and it was given out of an abundance of precaution to insure [that] the rights of this defendant are not violated, that he has ahad a fair trial by an impartial jury and a jury that understands the importance of their verdicts. And for the purpose of sentencing phase, the Court's same remarks will apply. The Court finds that this jury has been in no way tainted by the remarks of counsel."
The sentencing hearing was then held before the jury, after which the jury returned an advisory sentence of life imprisonment without parole.
"`"Under Caldwell v. Mississippi, 472 U.S. 320 [328-29], 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), `it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentencing verdict was `advisory' and a `recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell. `[C]omments which accurately explain the respected functions of the Judge and jury are permissible under Caldwell "as long as the significance of [the jury's] recommendation is adequately stressed."' Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir.1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498, (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified, Adams v. Duggar, 816 F.2d 1493 (11th Cir.1987), and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role and sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: `the trial judge's and the prosecutor's remarks clearly define the jury's role in this sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform *1042 the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra."'"
Smith v. State, 588 So.2d 561, 574 (Ala.Cr. App.1991), quoting Smith v. State, 581 So.2d 497, 519-20 (Ala.Cr.App.1990), reversed on other grounds, 581 So.2d 531 (Ala.1991). See also Kuenzel v. State, 577 So.2d 474, 502 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
In the present case, the trial judge correctly informed the jury of its role in the sentencing process, during his instructions at the sentencing phase. Moreover, even if the prosecutor's comments downplayed the jury's role in the sentencing process by not stressing the significance of its recommendation, because the trial court sustained defense counsel's objections to the remarks and promptly and accurately instructed the jury and because the jury ultimately returned an advisory verdict of life imprisonment without parole, any error was harmless and did not prejudice the appellant. Cf. Samuels v. State, 584 So.2d 958 (Ala.Cr.App.), cert. denied, 584 So.2d 963 (Ala.1991) (although defendant alleged that trial court improperly denied his motion for judgment of acquittal, any error was harmless because he was acquitted of this charge). See also Hagood v. State, 588 So.2d 526, 532 (Ala.Cr.App.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992) ("`"[t]here is a prima facie presumption against error where the trial court immediately charges the jury to disregard the improper remarks or answers."'"). Dennis v. State, 584 So.2d 548 (Ala.Cr.App.1991) (motion for mistrial properly denied where trial court sustained appellant's objection to prosecutor's comment during closing argument and gave the jury curative instructions).

B
The record indicates that, after the jury returned an advisory verdict of life imprisonment without parole, the trial judge ordered that a presentence investigative report be compiled and submitted to him, so that it could be considered in arriving at a sentence. In overriding the jury's advisory verdict and entering a sentence of death by electrocution, the trial judge noted that he had considered the presentence investigative report. However, prior to his entry of sentence and during the introduction of testimony at this sentencing hearing, defense counsel stated as follows:
"Judge, I want the record to reflect that [the district attorney] and ... the assistant district attorney[who] may be assisting [the district attorney] in this matter this morning and I also point out to the Court that [assistant district attorney's] wife is the very one who filed the presentence report with this Court and we object to that and we object to it. And the Court overruled the objection. And here we have the husband of the parole and probation officer who prepared the presentence report upon which this Court will base at least a portion of it's judgment aiding and assisting in the prosecution and attempting to kill this defendant."
The trial court overruled the appellant's objection. The wife of the chief assistant district attorney testified during the hearing that she had not discussed with her husband, or referred to, this case in preparing her report. Thereafter, following the introduction of the testimony in evidence at this hearing, the trial court stated as follows:
"... I think it's appropriate for me to get into the record the findings of the Court as far as the State's probation officer's ... relationship with the chief assistant district attorney.
"First of all, the Court finds that the presentence investigation report which has been entered as State's Exhibit C was very wellwas professionally done. That it's very comprehensive, and the key finding of the Court is that the defendant has been given an opportunity to rebut anything contained in that report as is required by law. And my fourth finding is that there has been no proof of misinformation that [the chief assistant district attorney] did not aid in providing information used in this report. It was further testified and the Court finds that ..., [the chief assistant district attorney] didn't even ask any questions about the report. The key thing *1043 here is the report was well prepared, very comprehensive and that the defendant was given an opportunity to rebut any information contained in that report."
This court finds no impropriety or prejudice, in this case, caused to the defendant because of the marital relationship between the author of the presentence investigative report and the chief assistant district attorney for the following reasons: the total evidence introduced against the appellant at the sentencing hearing, the reasons enunciated by the trial court, and our own thorough examination of the presentence investigative report. Cf. United States v. Bronston, 491 F.Supp. 593 (S.D.N.Y.1980), affirmed, 658 F.2d 920 (2d Cir.1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982) (a judge need not recuse himself where one of his two law clerks was married to the assistant United States Attorney who investigated and presented the case to the grand jury. Although the law clerk was temporarily assigned to another judge, the court's reasoning was based on ethical rather than legal considerations.

C
The appellant entered pleas of guilty and not guilty by reason of mental defect in the present case. After the State rested its case at the guilt phase, the following transpired:
"[DEFENSE COUNSEL]: We have subpoenaed two doctors from the Taylor-Hardin Secure Medical Facility, Dr. Mohabbat and Dr. Bryant. I understand that they have filed something with the Court with the clerk.
"THE COURT: I am not aware of that at this time, but go ahead.
"[DEFENSE COUNSEL]: Requesting that they not appear or citing a statute where they say they are not required to appear. But we would command that those witnesses be produced.
"THE COURT: What says the State? I understand your point.
"[DISTRICT ATTORNEY]: May it please the Court, of course those witnesses he speaks of have a statutory exemption from appearing if they claim it. This defendant and his counsel has had the opportunity, and has deposed those doctors.
"[DEFENSE COUNSEL]: Your Honor.
"THE COURT: Yes, sir.
"[DEFENSE COUNSEL]: This defendant was not present when those doctors were deposed. This defendant was incarcerated in the Coffee County jail here in Coffee County. The depositions, such as they were, were conducted at the Taylor-Hardin Secure Medical Facility in Tuscaloosa as per this very statute [the prosecutor] speaks of. And certainly that cannot be a substitute for the presenting of live testimony before a jury.
"THE COURT: Are they here?
"[DEFENSE COUNSEL]: No, sir. They are not here.
"THE COURT: Anything further?
"[DISTRICT ATTORNEY]: May it please the Court, by and through subpoena, one of the doctors who he deposed is here.
"THE COURT: Which one is that?
"[DISTRICT ATTORNEY]: Dr. Nagi.
"THE COURT: Anything further on this point?
"[DEFENSE COUNSEL]: No.
"THE COURT: Of course, Counsel, the Court is aware of the statute in question. The Court finds that the defendant has givenbeen given an opportunity to confront and cross-examine these witnesses. The Court has available to it the depositions of these witnesses. The Court finds a statute allows these witnesses to present their testimony through deposition. Counsel for the defense has been accorded monies to travel to Tuscaloosa, Alabama, or that areaTuscaloosa County, Alabama for the purposes of taking of these depositions. The Court has also approved monies for purposes of having a court reporter hired in Tuscaloosa County, Alabama to take down the testimony of these two witnesses and, of course, that's been done. And the Court has a copy of their depositions or their testimony. You couched that in part, in a way, a motion to require them to come in and testify physically present, being here before this jury?

*1044 "[DEFENSE COUNSEL]: We want them to honor the subpoenas that were issued for them and they were served with. And I believe the Court record will reflect they were served with them. We can get the clerk in and testify to that unless [the prosecutor] is willing to stipulate.
"THE COURT: Y'all can stipulate to that, can't you?
"[DISTRICT ATTORNEY]: Sure.
"THE COURT: So stipulated.
"[DEFENSE COUNSEL]: They were served.
"THE COURT: They were served, these two witnesses.
"[DISTRICT ATTORNEY]: Judge, we would like for this record to be clear, though, there were three doctors deposed by this defendant's counsel. All three of them have been served with subpoenas. It's our understanding that two of them are not here and claimed exemption under the rule. There is one of them here that he deposed that examined this particular defendant, and that's Dr. Nagi. We want this record to show that.
"[DEFENSE COUNSEL]: Well, I don't think the prosecutor has a right to run our case for us.
"[DISTRICT ATTORNEY]: Well, I'm not trying to run your case.
"[DEFENSE COUNSEL]: We are entitled to declare those witnesses we want.
"THE COURT: One of these witnesses is in fact present and two are claiming their exemption as provided by statute, Alabama law.
"[DEFENSE COUNSEL]: We demand that theythat those subpoenas be honored.
"THE COURT: That request is denied.
"[DEFENSE COUNSEL]: Your Honor, may we further state into the record that the ruling of this Court is in error, that the denial of the right to subpoena witnesses and have them present for live testimony is in violation of this defendant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution.
"THE COURT: I will back up. I am going to require that these witnesses appear here if it takes them getting down here all night long. I will issue an appropriate order and we are going to have them here tomorrow morning.
"[DISTRICT ATTORNEY]: All right, sir.
"THE COURT: I will reverse myself and grant your request.
"If the clerk would get me the appropriate attachments, I will insure that they are down here. You don't have to do that ... this very second. But as long as you do it, you know, in a few minutes, I would appreciate it.
"We are going to bring this jury back in here and
"[DEFENSE COUNSEL]: Judge, may we have just a minute?
"THE COURT: Yes, sir.
"THE COURT: For the record, I have read that statute. The Court finds that it violates the defendant's right to confront and cross-examine physically being present as provided by the United States Constitution. This Court does hereby declare that that statute is unconstitutional, in violation of the United States Constitution.
"[DEFENSE COUNSEL]: If the Court please, the defendant withdraws its motion to compel these two doctors from Tuscaloosa to personally appear before the Court during the course of this trial.
"THE COURT: Opposed by the State. Motion granted."
Thereafter, the appellant rested his case without presenting any witnesses and, while the appellant prepared to make certain motions outside the presence of the jury, the trial court made the following statement:
"... While you are fixing to do that, let me specifically say the section of the Alabama Code that's been just declared unconstitutional is Section 22-50-22, which provides neither the superintendent nor a physician of a state mental health facility or hospital shall be compelled as a witness to testify as an expert in any case or on any question of insanity, psychological medicine in the state provided that he should certify in writing within ten days after the service of the summons that his absence from the *1045 facility or hospital, in his best judgment, will interfere with his professional duties and the welfare of the patients under his care. But defendants in criminal cases in the state, by consent of the defendant, and, in civil cases, either party may take the deposition of the superintendent or of any physician as to all matters involving his or their expert opinion when such testimony is admissible.
"I will issue an official ruling in writing on this, but for the purposes of this hearing, this Court finds that Section 22-50-22 violates a defendant charged with commission of a criminal offense constitutional right to confront or cross-examine all witnesses against him being physically present to do so. Certainly a constitutional violation. Both the State of Alabama and the United States of America; and that statute is hereby declared unconstitutional."
In the present case, the appellant suffered no prejudice pursuant to this statute or the trial court's finding of the statute as unconstitutional. After complaining that his rights to confrontation were violated by the statute, because the trial court found the statute to be unconstitutional, the appellant could not be prejudiced thereby. Moreover, the appellant then withdrew his motion to compel the attendance of the doctors and the appellant was able to use their absence in his closing argument to the jury during the sentencing phase.[5] Therefore, application of the statute and the trial court's finding the statute unconstitutional did not constitute plain error to the appellant in the present case. Rule 45A, A.R.App.P.
However, in so holding, we conclude that the trial court's determination that this statute is unconstitutional was correct in this case. This finding is based on two facts: the appellant was not present when the physicians were deposed, and the appellant faced a possible sentence of death.
Section 22-50-22, Code of Alabama 1975, states as follows:
"Neither the superintendent nor a physician of a state mental health facility or hospital shall be compelled to attend as a witness to testify as an expert in any case or on any question of insanity or psychological medicine in the state; provided, that he shall certify, in writing, within 10 days after the service of the summons, that his absence from the facility or hospital, in his best judgment, will interfere with his professional duties and the welfare of the patients under his care. But defendants in criminal cases and the state by the consent of the defendant and, in civil cases either party may take the deposition of the superintendent or of any of the physicians as to all matters involving his or their expert opinion when such testimony is admissible."
This Code section dates back to 1896, and the rationale behind its enactment was most likely due to logistical hardships of distance and travel and the inadequate backup personnel at the institutions. However, these factors must be weighed against the gravity of the possible sentence faced by the defendant, especially where his entire defense is based upon his claim of insanity or mental incompetence, as well as the defendant's right to be present and confront the witnesses, especially where, as in this case, the appellant remains in jail and is not present for the depositions.
"The right of a person on trial for a crime to be confronted with witnesses against him is secured or guaranteed by the Sixth Amendment to the Federal Constitution and by the constitutions of all except a small number of states. It is now established that the confrontation provision of Sixth Amendment is obligatory on the states by reason of the Fourteenth Amendment of the United States Constitution.
"The common-law right to confrontation is not without certain well-recognized exceptions, *1046 and the federal courts have recognized that the constitutional guarantees of the right carry with them the exceptions.
"The exceptions are not static, and they may be enlarged from time to time if there is no material departure from the reason underlying the constitutional mandate guaranteeing to the accused the right to confrontation. But the courts are careful to see that the right is not lost by the extension of exceptions."
21A Am.Jur.2d Criminal Law, § 721.
In general, a deposition or "statement as to what an absent witness to the prosecution would testify to if present, is not admissible, as being in violation of accused's right to be confronted with the witness, unless accused stipulates as to what the witness would testify to if present, and agrees that such statement may be received in evidence." 23 C.J.S. Criminal Law § 1121.
"It has been held, however, that the right of confrontation is not violated by an admission by counsel for accused that an absent witness whom the State desires to call would testify to certain facts, where such facts are favorable to accused and the testimony if given would tend to injure the prosecution.
"While, in holding that it is improper to compel accused to go to trial in the absence of a material witness for him on the mere admission by the prosecution of what such witnesses' testimony would be, subject to impeachment, it has been said that accused would lose the advantage of confronting such witnesses with impeaching witnesses; the propriety of admitting the reading of a statement as to what the testimony of an absent witness for accused would be has been recognized under certain circumstances."
23 C.J.S. § 1121.
Where a defendant is charged with a capital offense, his right to be present and to confront witnesses against him becomes more important and an infringement on the right can only be held proper where the defendant could have suffered no prejudice, because his or her presence could not have been useful toward aiding his or her defense. See Harris v. State, 632 So.2d 503 (Ala.Cr. App.1992).
"Whether the report of the examining [psychiatric] doctors may be admitted into evidence at the trial has been held to depend on the presence of the doctors as witnesses in the case.
"If the doctors did not testify, it has been held that their report is not admissible, since to admit the report under such circumstances would violate the defendant's right to confront and cross-examine witnesses against him.
"Theoretically, there appears to be a distinction between the right to confront witnesses where the report of alienness deals with the defendant's sanity at the time of the crime and where it deals with his sanity at the time of the examination or trial.
"In the former case the constitutional guarantee is obviously applicable, since the result of the examination may have a direct bearing on the question of the defendant's guilt or innocence.
"There is more doubt, however, as to the constitutional right to confront the experts in the latter case, since their report has no bearing on the defendant's guilt or innocence, but is generally regarded as only intended as an aid to the court in determining whether the trial should proceed.
"This distinction has not been particularly noted in the cases; however, probably in most instances the examination deals with mental condition both at the time of the crime and at the time of the examination."
Annotation: Criminal Law-Psychiatric Examination, 32 A.L.R.2d 452-53, citing Smith v. State, 200 Ark. 1152, 143 S.W.2d 190 (1940) (sanity report held inadmissible where none of the doctors who prepared the report were present at trial as witnesses, "the appellate court ruling that these rights were not mere privileges, to be granted or withheld at the discretion of the court, but were substantive rights possessed by the accused which could not be denied to him" and the defendant's theory of defense was based on insanity.) West v. State, 209 Ark. 691, 192 S.W.2d 135 (1946) (prosecutor impermissibly read into *1047 evidence a report prepared by superintendent of state hospital, where defendant had been committed for a sanity examination prior to trial, in violation of defendant's right to be confronted by witnesses against him and to cross-examine them). Benton v. State, 31 Ala.App. 338, 18 So.2d 423, cert. denied, 245 Ala. 625, 18 So.2d 428 (1944) (report by lunacy commission could not be admitted at trial even though defendant sought its introduction, because it violated defendant's constitutional right to confront and cross-examine the witnesses against him).[6]
Therefore, because this statute permits a clear violation of a capital defendant's rights to confrontation, it is unconstitutional under the facts of this case.

VIII
In accordance with § 13A-5-53, Code of Alabama 1975, we have reviewed the record, including the guilt and sentencing proceedings, for any error which adversely affected the rights of the appellant, and we have found none. See Issue VII. Nor do we find any evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.
The trial court properly found the existence of three aggravating circumstances: that the appellant had previously been convicted of a felony involving the use or threat of violence; that the crime was committed during a robbery in the first degree; and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. In his sentencing order, the trial judge stated as follows:
"The State of Alabama has proven beyond a reasonable doubt that this capital defendant was previously convicted of a felony involving the use or threat of violence to the person provided in Code of Alabama 1975, Section 13A-5-49(2).
"In 1973, this capital defendant was convicted in the Circuit Court of Covington County, Alabama, of capital robbery and was sentenced to twenty (20) years in the penitentiary, State of Alabama. After serving nearly eight (8) [years] of that twenty-year sentence, the Defendant was paroled and was subsequently discharged from parole. Therefore, this Court finds that this § 13A-5-49(2) aggravating circumstance does exist. Further, the State of Alabama proved beyond a reasonable doubt that the capital offense was committed while this Defendant was engaged in the commission of a robbery. Therefore, the Court finds that the Code of Alabama 1975, Section 13A-5-49(4) aggravating circumstance does exist.
"The State of Alabama also proved beyond a reasonable doubt the capital offense committed by this Defendant was especially heinous, atrocious or cruel, compared to other capital offenses. In making this determination the Court has applied the limiting interpretation of the aggravating circumstance set out in Ex parte Kyzer, 399 So.2d 330. The Court finds that the crime was a `conscienceless or pitiless homicide... which [was] unnecessarily torturous to the victim.' The State of Alabama, through the evidence proved beyond a reasonable doubt that this Defendant's elderly 87-year-old victim was subjected to unnecessary and substantial pre-mortem suffering and pain before this Defendant ultimately killed his victim. In addition to the expressed opinions of the State's expert, Dr. Alfredo Paredes, the Defendant's own knowledgeable, intelligent and voluntary statement referred to the agony and suffering which the Defendant's victim went through before the victim's death. Therefore, this Court finds that the Code of Alabama, 1975, Section 13A-5-49(8) aggravating circumstance does exist.
"(The Court does further note that this Judge has served as a State Judge continuously since 1976. This Judge further notes that he has presided over numerous preliminary hearings and juvenile certifications involving Defendants charged with capital offenses in this Circuit and incident thereto has become aware of the facts of these capital cases. Since 1976, this Judge has presided over evidentiary hearings involving all but one of the capital offenses which have been tried in Coffee County, *1048 Alabama. This Court further notes that this is the third Defendant tried before this Judge and convicted for the commission of a capital offense. This Judge is also personally aware of the facts and circumstances of other capital offenses committed by convicted Defendants in adjacent Circuits and this Judge has conducted hearings as relates to some of those capital Defendants and thus learned of facts and details of those cases. The record will also note that this Judge has made a point to read the available ascertained reported facts relating to every capital conviction which convictions have occurred in the State of Alabama since July 1, 1981. This Court makes known and finds that the capital offense committed by this Defendant is the most heinous, atrocious or cruel when compared to all of the capital offenses this Judge is personally aware of. This Court further finds that the capital offense committed by this Defendant is especially heinous, atrocious or cruel when compared to all reported facts of the capital offenses this Judge has read about and which convictions have specifically been reported since 1981 and many reported prior thereto)."
The trial court also properly found the existence of no statutory mitigating circumstances, but considered several non-statutory mitigating circumstances and found the existence of some. In his sentencing order, the trial court found:
"This Court considers and finds as a non-statutory mitigating circumstance the fact this Defendant has had alcoholic and other substance abuse problems for a number of years, and the Court has further considered that there is some evidence that this Defendant was `high' on some type of intoxicant at the time of the commission of this capital offense. For the purpose of this sentencing, this Court considers it to be a fact that this Defendant was under the influence of some type of intoxicant at the time of the commission of this capital offense and that fact may have been a factor in the crime. However, the Court makes it clear that the Court does not find that the Defendant was severely intoxicated or delusional at the time of the commission of the capital offense, nor does the Court find that the intoxication caused the capital offense. Even Defendant's own confession reflects Defendant knew fully what he was doing and the wrongfulness of what he had done. The Court also finds and considers that the Defendant, at the time of the crime, was, in his words, broke, disgusted and needing some money. However, it needs to be made perfectly clear this Court does not find that this Defendant was in any type of emotional distress at the time of the commission of the capital offense.
"This Court also finds and considers as a non-statutory mitigating circumstance the fact that this Defendant was from an economically poor background, a broken or almost non-existent home where this defendant had no father figure and where this Defendant was abandoned by his mother at an early age, was subjected to violence and further that his home life was one described to be `hellish ... and not one of love and affection.' The Court has further considered that while this Defendant was young, he left home and traveled about by himself and had to fend for himself.
"This Court also finds and considers as a non-statutory mitigating circumstance the fact that this Defendant is poorly educated, having dropped out of school in the sixth grade. While the evidence indicated that this Defendant has an IQ above seventy (70) and that this Defendant is not mentally retarded, this Court has considered that this Defendant is of borderline intelligence, and this Court has considered these facts as non-statutory mitigating circumstances.
"All of the statutory and non-statutory mitigating circumstantial evidence submitted in arguments made by Defendant's attorneys have been carefully considered. This Court has applied the standards of proof set out in the Code of Alabama 1975, Section 13A-5-45(g), to issues involving the factual existence of a mitigating circumstance, but the Court has not disregarded any evidence tending to establish any mitigating circumstance."
*1049 The trial court also considered the jury's advisory recommendation of life imprisonment without parole. The trial court then properly weighed the aggravating and mitigating circumstances and concluded that death was the appropriate sentence.
After an independent weighing of the aggravating and mitigating circumstances in this case, we find that the evidence supports the trial court's conclusion and indicates that death was the proper sentence. The appellant's statement, actions, role in the offense, and the evidence supporting his guilt, lead us to this conclusion.
The sentence of death in this case is neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and the defendant. See Kuenzel v. State, 577 So.2d 474, 530 (Ala.Cr. App.1990), affirmed, 577 So.2d 531 (Ala.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Stephens v. State, 580 So.2d 11, 25-26 (Ala.Cr.App.1990), affirmed, 580 So.2d 26 (1991); Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), affirmed, 600 So.2d 372 (Ala.1992). Therefore, the appellant's conviction and sentence of death are proper, and the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur with BOWEN, J., concurring in result with opinion.
BOWEN, Judge, concurring in result.
In Part VI, the majority finds that the appellant's rights were violated when the police continued to question him after he requested that the interrogation cease. Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). I agree. The majority also finds that the "taint" of that violation was dissipated by the occurrence of a significant intervening circumstance. Cf. Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In effect, the majority concludes that the appellant confessed, not because his will was overborne by the police, but because he heard a friend, who was present at the police station, wrongly implicate a third party in the commission of the offense. I also agree with that conclusion, but only because there is not enough evidence to suggest that the presence of, and the comments made by, the appellant's friend were attributable to the police.
"Interrogation" consists of "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980) (footnotes omitted). "Psychological ploys" designed to elicit incriminating responses may constitute interrogation. Arizona v. Mauro, 481 U.S. 520, 529, 107 S.Ct. 1931, 1936-37, 95 L.Ed.2d 458 (1987). Nevertheless, officers do not interrogate a suspect simply by hoping that he will incriminate himself. Id. If the police had brought the appellant's friend to the police station and had induced her to make the remarks she made, knowing that such remarks would prompt the appellant to talk, then those actions would have constituted further interrogation. However, as in Gilchrist v. State, 585 So.2d 165 (Ala.Cr.App.1991), "there was no evidence here that [the appellant's friend] was sent `in to see [the appellant] for the purpose of eliciting incriminating statements.' " Gilchrist, 585 So.2d at 175 (quoting Arizona v. Mauro, 481 U.S. at 528, 107 S.Ct. at 1936). As we observed in Gilchrist,
"There is no evidence in this record that the police ever asked or directed, or induced or threatened [the defendant's friend] to get information from the defendant. She cannot, therefore, be deemed an `agent' of the police. See State v. Bruneau, 131 N.H. 104, 552 A.2d 585, 588 (1988) (Souter, J.) (establishing an agency relationship between the police and a third party `require[s] proof of some affirmative action by a police officer or other governmental official that preceded the interrogation and can reasonably be seen to have induced the third party to conduct the interrogation that took place'). See also United States v. Taylor, 800 F.2d 1012, 1016 (10th Cir.1986), cert. denied, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987) (`No agreement was made between [the *1050 informant] and the government and no benefits accrued to [the informant] for his cooperation')."
Gilchrist, 585 So.2d at 175.
In Part VII-C, the majority finds that "the appellant suffered no prejudice pursuant to [Ala.Code 1975, § 22-50-22] or the trial court's finding of the statute as unconstitutional," supra at 38. It then proceeds to uphold the trial court's determination that the statute is unconstitutional. The majority's discussion of the constitutionality of § 22-50-22 is not necessary to the resolution of any issue presented in this case, is purely dicta, and should have been omitted.
NOTES
[1] The appellant's statement, in which he confessed to committing the offense, was contained on the tape in question.
[2] It should be noted that, although the appellant did request that the questioning cease, he did not request or in any way invoke his right to counsel. Cf. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
[3] There was testimony presented that the officers were well acquainted with the appellant's friend and that she had been in and out of trouble. There was further testimony that her mental capacity was somewhat diminished. Although there was no evidence of the manner in which she arrived at the police station, witnesses in the lobby stated that she walked in to the station alone and sat by a water fountain at the entrance. Thereafter, when the appellant came out of the interrogation room, she approached him to speak with him. There was an indication in the record that she subsequently ran down the hall and that she was pursued by two sheriff's deputies. During his final statement, the appellant voiced some curiosity or concern as to why she had come to the station and why she had implicated the third party. He speculated that she might have been "put up to it." However, no further evidence was introduced to support this supposition.
[4] The State attempted to have the chief assistant district attorney excused from the rule in this case because of his pivotal role in the investigation and preparation of the case.
[5] During his closing argument to the jury at sentencing, the defense counsel stated, "... and they have introduced a report here by three people that interviewed this man at Taylor-Hardin. Those three people didn't show up. They weren't here to tell you. They weren't here where... and I could cross-examine them and find out how long they spent with him. And I think you would be shocked if you knew."
[6] No mention is made in this case of the statute in question.